## In re GABRIELLE D.

### No. 2011–40–Appeal.

Supreme Court of Rhode Island.

March 26, 2012.

Karen A. Clark, Department of Children, Youth & Families, for DCYF.

Shella R. Katz, Court Appointed Special Advocate, for CASA.

Catherine Gibran, Office of the Public Defender, for Respondent.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA JJ.

## OPINION

Justice ROBINSON, for the Court.

The respondent father, Armand D.,[1] appeals from a Family Court termination of parental rights decree with respect to his daughter, Gabrielle D. (Armand's several appellate contentions are set forth in section I B of this opinion, *infra*.)

This case came before the Supreme Court for oral argument pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After considering the record, the memo-

randa submitted by the parties, and the oral arguments of counsel, we are satisfied that cause has not been shown and that this appeal may be decided without further briefing or argument.

For the reasons set forth in this opinion, we affirm the judgment of the Family Court.

## I

### Facts and Travel

On October 5, 2009, the Rhode Island Department of Children, Youth and Families (DCYF) filed a petition to terminate the parental rights of Armand with respect to his daughter, Gabrielle (born May 11, 1999). In its petition, DCYF alleged the following grounds for the termination of Armand's parental rights: (1) Armand's chronic substance abuse; (2) Gabrielle's placement with DCYF for at least twelve months with no substantial probability that it would be possible for her to return to Armand's care within a reasonable period of time; (3) Armand's behavior or conduct that was seriously detrimental to Gabrielle and that was of such a duration as to render it improbable that he would be able to care for her for an extended period of time; and (4) Armand's abandonment or desertion of Gabrielle. *See* G.L.1956 § 15–7–7(a)(2)(iii), (a)(2)(iv), (a)(3), and (a)(4).

A trial was held before a justice of the Family Court on April 8, May 28, September 10, September 23, and October 15, 2010. On these dates, the trial justice heard testimony from the following witnesses: Armand; Dr. John Parsons (a psychologist who had worked with Armand and Gabrielle); Laura Nevins (the DCYF caseworker assigned to Gabrielle); Wil-

---

1. Although we refer to respondent by his first name, as is customary, we certainly mean no disrespect. We also note that respondent's name is spelled differently on Gabrielle's birth certificate; however, we will utilize the spelling that is used throughout most of the record (*i.e.*, Armand).

liam S. Carey (the licensed independent clinical social worker assigned to Gabrielle); Louis Petrin (a case manager at NRI Community Services);[2] and Becky Chartier (a substance abuse counselor at NRI Community Services). The trial justice also conducted an *in camera* interview of Gabrielle. We summarize below the pertinent portions of the trial testimony of the several witnesses.

## A

## Trial Testimony

### 1. The Testimony of Armand

Gabrielle's father, Armand D., testified that, at the time of Gabrielle's birth in 1999, he and her mother were living together in South Carolina; he further testified that thereafter, on August 13, 2006, Gabrielle's mother passed away. Armand acknowledged that, after the death of Gabrielle's mother, Gabrielle and he moved to Rhode Island, where he had previously lived.

Armand testified that DCYF became involved with him and his daughter after their move to Rhode Island from South Carolina in 2006, providing him with services and "some help for [Gabrielle]." Specifically, Armand acknowledged that,

during the process of the reunification[3] with Gabrielle, DCYF provided "services in [his] home;" he added that those services included having a Spurwink[4] "parent aide" come to the home. He affirmed that the case was closed in April of 2007.

Armand also affirmed that DCYF "got re-involved" with him in September of 2007 as the result of a substance abuse relapse on his part; he added that, before that relapse, he had "been clean" for at least the preceding one-and-a-half years. He testified that, when he sought treatment in connection with his relapse, he asked his niece to take care of Gabrielle because he "needed to get [himself] some help * * *." Armand stated that Gabrielle stayed with his niece for "around nine or ten months, [maybe] a year."[5]

Armand testified at trial that he had been seeing both a social worker and a counselor at NRI Community Services. Armand stated that, at the time of trial, he had been receiving treatment in connection with his substance abuse relapse for over two years in the form of one-on-one drug treatment. Armand proceeded to testify that, in connection with that treatment, he had been giving scheduled "screens" for substance abuse. He further testified that he (not DCYF) had arranged for this

**2.** NRI is an abbreviation for Northern Rhode Island.

**3.** The record contains few details about the first removal of Gabrielle from Armand's home. However, it is clear that there was such a removal and that eventually Gabrielle came "back home to [Armand]."

**4.** Spurwink is a nonprofit corporation whose mission is to "assist children and adults with disabilities in pursuing social, educational, vocational and other life enhancing opportunities." spurwink|ri, *Mission/Vision & Values*, http://spurwinkri.org/mission-vision-values (last visited Mar. 2, 2012); *see* spurwink|ri, *About spurwink|ri*, http://spurwinkri.org/

about-spurwinkri (last visited Mar. 2, 2012). The organization's services include the following: "24–hour residential care, support for individuals living in their own homes, supported employment and support to parents with disabilities at-risk of losing their children because of possible neglect." spurwink|ri, *About spurwink|ri*, http://spurwinkri.org/ about-spurwinkri. In Rhode Island, Spurwink serves more than 175 people. *Id.*

**5.** The record indicates that, in August of 2008, Gabrielle moved from the home of Armand's niece to a non-relative foster home, where she now resides permanently; hence, Gabrielle has remained out of her father's home since September of 2007.

treatment. Armand additionally acknowledged having attended an inpatient treatment program in 2008 due to the fact that he had resumed using marijuana.

Armand further testified that he never received a case plan from his caseworker, Laura Nevins, and never had occasion to discuss a case plan with Ms. Nevins. Armand added that he does not believe that DCYF had "set up" any services for him.

Armand acknowledged that, when Gabrielle was removed from his home in 2007, the DCYF caseworker (Ms. Nevins) scheduled weekly visits for father and daughter, beginning in November of 2007. Armand conceded that he missed a number of those visits in January and February of 2008; later, however, he corrected himself and testified that he had missed only one visit, and he said that that was a result of what he referred to as "a bus problem."

Armand testified at trial that his visits with Gabrielle had been suspended since approximately July of 2008. He further testified that he did not know that he could reopen visitation. Armand stated that, a year and a half prior to trial, he asked a DCYF employee how his daughter was doing in school, but he said that the employee responded that DCYF "didn't have to tell [him] that."

Armand testified that he had not provided financial support for Gabrielle since she last lived with him [6] due to the fact that his income consists of SSI payments (which he receives as a result of his disabilities).[7]

Armand testified at trial that, since visitation was suspended, the only time that he has had the opportunity to visit with Gabrielle was on one particular day a week and a half prior to the trial. That visit took place in the presence of Dr. Parsons. Armand testified that, during that visit, he and Gabrielle "didn't speak too much" and that he "didn't feel very comfortable there." He elaborated that he "didn't know if [he] could talk to [his] daughter much at all." Armand acknowledged that, during the visit in Dr. Parsons's presence, Gabrielle told him that she did not want to live with him.

### 2. The Testimony of Dr. John Parsons and his Report

Doctor John Parsons testified that he became acquainted with Armand and Gabrielle when Ms. Nevins referred Armand to him for a psychological evaluation in August of 2008. Doctor Parsons stated that he saw Armand for several months beginning in December of 2008 for the purpose of completing the requested evaluation. Doctor Parsons testified that, as part of the evaluation process, he was asked to observe Armand with Gabrielle in the context of interactive sessions. Doctor Parsons stated that, in August of 2009, he completed a report based on his evaluation of Armand. That report was entered as a full exhibit at trial.

In his report, Dr. Parsons stated that Ms. Nevins referred Armand to him due to the fact that Armand had been testing positive for marijuana and was justifying that behavior as being "something he had done since the age of nine" and also as being an aid for "his back pain." Doctor Parsons's report stated that a further reason for the referral was the allegation that Armand had purportedly locked Gabrielle in her room while he and his friends smoked crack cocaine. The report also stated that a reason for the referral was

---

**6.** It will be recalled that Gabrielle had not lived with her father since September of 2007—over two-and-a-half years prior to the trial. *See* footnote 5, *supra.*

**7.** With respect to his disabilities referenced in the text, Armand testified that he has had brain surgery and also has experienced depression in the past.

the fact that Armand had been diagnosed with a number of mental health issues, in addition to having a history of neurosurgery and multiple strokes. Doctor Parsons stated that, in view of the just-summarized considerations, a comprehensive psychological evaluation and a parenting assessment were requested by DCYF.

In his report, Dr. Parsons concluded that "[r]eunification between [Armand] and his daughter is at high risk;" he then listed a number of findings in support of that conclusion. Specifically, Dr. Parsons stated that Armand had been diagnosed with a multitude of psychiatric conditions and had several other medical issues. He cited the fact that, as of the time when the report was written, Armand had had five psychiatric hospitalizations (the most recent having been in 2008), and he noted that Armand's stays in the hospitals ranged from two to twenty-seven days. He further stated that Gabrielle disclosed that there had been occasions when her father had had friends at their home where they smoked crack cocaine. Doctor Parsons additionally wrote that Gabrielle had to care for herself much of the time because her father would sleep late into the afternoon.

In his report, Dr. Parsons further supported his conclusion that reunification was "at high risk" by citing the fact that Armand had failed to transport Gabrielle to her outpatient psychotherapy appointments and was having difficulty discharging his parental responsibilities. Doctor Parsons wrote that Armand had demonstrated "an inability to set appropriate boundaries with his daughter" and had "limited follow[-]through with consequences." Doctor Parsons noted that NRI Community Services "strongly recommended that Gabrielle not be reunified with her father because[, in that agency's view,] he was not able to provide for her physical, developmental, or emotional needs."

At trial, Dr. Parsons stated that, during the interactive session between Armand and Gabrielle, there was "no evidence that [Armand] was bonded to his daughter;" Dr. Parsons testified that Armand did not ask his daughter any questions during that interactive session, despite the fact that he had not seen her since October of 2008. According to Dr. Parsons's testimony, during the session Gabrielle "tried to engage her father," but he did not respond. It was Dr. Parsons further testimony that "Gabrielle * * * gave up and she didn't address [Armand] at the end of the session." Doctor Parsons additionally stated that Armand had said that he cared for and loved Gabrielle; Dr. Parsons said that he believed that statement, but he added that there was no demonstration of those feelings by Armand.

Doctor Parsons recommended that permanency planning[8] be initiated because, in his view, Armand did not have the "cognitive, emotional or social skills to successfully and safely parent [Gabrielle]."

### 3. The Testimony of Laura Nevins

Laura Nevins, the DCYF caseworker assigned to Gabrielle, also testified at trial. Ms. Nevins testified that she was assigned to Gabrielle in September of 2007[9] after

---

8. Doctor Parsons elaborated that by the term, "permanency planning," he referred to the fact that it was a desideratum on his part that "someone, other than [Armand] be the primary caretaker of [Gabrielle]."

9. The assignment of Ms. Nevins to Gabrielle that is referenced in the text constituted the second time that she had been so assigned. Ms. Nevins testified that the first time that she was assigned to Gabrielle was in the period from September through December of 2006, after Armand and Gabrielle had come to

Armand had privately arranged for Gabrielle to live with his niece and had admitted himself to a hospital for treatment of his psychiatric and substance abuse problems. She stated that Gabrielle has remained out of her father's home since that time.

Ms. Nevins testified that she "believe[d] [that] the first case plan was done with [Armand]," which testimony we understand to mean that Armand had participated with Ms. Nevins in developing the first case plan.[10] Ms. Nevins further testified that she herself had been consistently doing case plans every six months; she added, however, that Armand "was homeless and not available, or did not want to speak with [her]." Ms. Nevins explicitly testified that, subsequent to the development of the first case plan, Armand had had "no participation in developing the [case] plan[s]."

Referring to the original (November 2, 2007) case plan, which was entered as a full exhibit at trial, Ms. Nevins testified that the "planning issues" presenting themselves at that time included the following: cooperating with substance abuse services; obtaining appropriate housing; maintaining mental health services for himself; maintaining mental health services for his daughter; and remaining substance free. Ms. Nevins proceeded to testify that she verbally reviewed this case plan with Armand over the phone and also presented it to him on the occasion of a visit. However, according to Ms. Nevins, Armand "said [he didn't] want to sign it."

Ms. Nevins further testified that, between September of 2007 and May of 2008, she supervised biweekly one hour visits between Armand and Gabrielle at a DCYF office. During those visits, which took place between September of 2007 and February of 2008, Ms. Nevins acknowledged that she was able to speak with Armand about certain issues and, most significantly, about substance abuse issues. She stated that, during those conversations, Armand "continued to state [that] he was going to smoke marijuana because he had [done so] since [the] age of 9, and it was going to become legal anyway."

It was further the testimony of Ms. Nevins that, between September of 2007 and February of 2008, Armand was inconsistent about attending to his mental health treatment. However, she went on to testify that he had been consistent with his treatment from February of 2008 to the time of trial, as evidenced by a report which she had requested from Louis Petrin, his NRI Community Services clinician.

Ms. Nevins testified that Armand had missed "three or four visits" with Gabrielle;[11] accordingly, in May of 2008, DCYF filed a motion seeking the suspension of visitation. After that motion was granted, Ms. Nevins's only contact with Armand was in court. She further stated that, when she needed to contact him, she would relay messages to him through his clinician at NRI Community Services, Louis Petrin. She testified at trial that, beginning in May of 2008, she had been requesting face-to-face contact with Armand; she added, however, that her requests were unavailing. Ms. Nevins additionally stated that, from May of 2008 to the time of trial, Armand had not contacted her by phone or letter. She further testified that she had

Rhode Island from South Carolina. She stated that, at the end of that period, Gabrielle was reunified with her father.

**10.** There was some confusion at trial as to whether or not the case plan referenced in the

text was ever signed by anyone, including the caseworker or her supervisor.

**11.** Ms. Nevins testified that "there wasn't consistent visitation" between February of 2008 and May of 2008.

not been able to "case plan" with Armand after the first case plan because she had been unable to reach him.

Ms. Nevins proceeded to testify that she did not make any referrals for Armand because he had made his own appointments for services. She did state, however, that she had requested and received a report from his substance abuse counselor at NRI Community Services, Becky Chartier.

### 4. The *In Camera* Interview of Gabrielle

The trial justice conducted an *in camera* on the record interview of Gabrielle. During the interview, Gabrielle stated that she was eleven years old and in the fifth grade; and she indicated that she had been with her foster family for approximately two years.

Gabrielle stated that she could not remember the last time that she lived with her father, but she added that it was "a long time ago." She stated that she "sometimes" likes to visit with her father, but she qualified that statement by saying "not really." When the Family Court justice inquired of Gabrielle whether or not she would like to see her father, she stated: "I don't want to see him." Gabrielle explained as follows why she did not want to see her father: "[H]e didn't raise me right. My mom raised me, but he just, like, lived with someone else."

### 5. The Testimony of William S. Carey

William S. Carey, who the parties stipulated was "an expert as a licensed clinical social worker in children and families," testified at trial that he served as a clinician for Gabrielle and that he began seeing her in July of 2009, after he was contacted by DCYF. He further stated that he saw Gabrielle for "the purpose of supportive services and individual and family counseling, if needed, in the foster home, for behavioral support, and just general clinical supports."

Referring to his March 16, 2010 report, which was entered as a full exhibit at trial, Mr. Carey testified that the only visitation between Gabrielle and her father of which he was aware took place at his office in that same month of March. Mr. Carey stated that that March visitation was the result of Armand's request that he be reunified with Gabrielle. It was Mr. Carey's further testimony that Armand "wanted to meet Gabrielle to talk with her about his understanding of, you know, her wanting to live with him and I think the statement that she did not want to live with him."

Mr. Carey stated that, during that March 2010 meeting, Armand asked Gabrielle whether she would like to come live with him, to which question Gabrielle responded: "[N]o." Mr. Carey testified that Armand's reaction to that response was "very appropriate" and was not negative or strong; Mr. Carey stated that, instead, "a conversation ensued around her time with him and how he changed and asking her to think about these things."

Mr. Carey proceeded to testify that, based on his interaction with Gabrielle, her "steadfast statements," and what little he knew about the family history prior to her placement, he perceived "a lack of relationship and a lack of her seeing Armand as her dad and as her caretaker and as the person that could take care of her." Accordingly, Mr. Carey acknowledged that it was his clinical opinion that it would not be in Gabrielle's best interest to reunify with Armand.

### 6. The Testimony of Louis Petrin

Louis Petrin, Armand's case manager at NRI Community Services, also testified at trial. Mr. Petrin testified that Armand presented himself to the intake depart-

ment of that agency and had not come there as the result of a referral. He testified that, for approximately three years prior to trial, he had been working with Armand concerning his depression, his substance abuse issues, and his cognitive impairment. (He said that by the latter term he was referring to Armand's "trouble memorizing things or remembering things.") Mr. Petrin also stated that he had worked with Armand concerning his housing and financial issues; he further stated that he had worked with him relative to meeting with his doctor and relative to "get[ting] his medication" from "the center."

It was Mr. Petrin's further testimony that "[e]arly on," he supported Armand relative to visiting Gabrielle through "doing visitation, visits at DCYF, [and] supervised visitations." Mr. Petrin further stated that, at the time Armand's case opened with DCYF, Ms. Nevins and he "talked quite frequently." He stated that "the gist" of his conversations with Ms. Nevins was that he "was assisting [Armand] in seeing—visiting his daughter, and they were supervised visitations at the DCYF center * * *." Mr. Petrin further testified that, until Gabrielle was removed from the home of Armand's niece, he would speak to DCYF "every couple of weeks." Mr. Petrin also testified that Ms. Nevins would call him on the occasions when she could not get in touch with Armand due to the fact that his address changed frequently.

Mr. Petrin testified that, after Gabrielle moved out of the home of Armand's niece, DCYF and he "didn't really keep much in contact." He elaborated upon that statement as follows:

"There was a change. [DCYF] didn't disclose where [Gabrielle] was, and Armand wasn't allowed to visit anymore, so [my] contact [with DCYF] changed.

[Ms. Nevins and I] didn't discuss the case as much anymore. In fact, I hardly ever talked to her after that."

Mr. Petrin further testified that he never provided any reunification services to Armand and Gabrielle.

### 7. The Testimony of Becky Chartier

Becky Chartier, Armand's substance abuse counselor at NRI Community Services, also testified at the trial in Family Court. Ms. Chartier testified that, from July of 2008 to the time of her trial testimony, she had worked with Armand concerning "his history of substance abuse, moving forward through staying clean and sober * * *." She added that Armand had experienced "situational stressors with a lot of loss that he's had, various stressors." Ms. Chartier stated that Armand had "made progress." She explained that statement by indicating that Armand had consistently seen her "for a long period of time [and] was able to address his substance abuse with [her] openly." Moreover, according to Ms. Chartier, Armand "took [her] recommendations."

### B

### The Trial Justice's Decision and Respondent's Appeal

On October 15, 2010, after closing arguments were made on behalf of the parties, the trial justice rendered his bench decision. In his decision, the trial justice reviewed the testimony of Armand, Dr. Parsons, Mr. Carey, Mr. Petrin, Ms. Nevins and Ms. Chartier, as well as the *in camera* interview of Gabrielle.

Following his summary of the testimony, the trial justice stated the following:

"There is not one small doubt in the mind of [the] Court, to quote some of the testimony [in the instant case], that [Armand] cares **about** his daughter.

Note that important distinction: He cares **about** his daughter. I cannot find one scintilla of evidence in this entire case that he cared or cares **for** his daughter." (Emphasis added.)

The trial justice explained as follows the "distinction" which, as his just-quoted statement indicates, he deemed to be important: "Beyond saying that he loves his daughter and wants her to live with him," Armand had done nothing to prove his love and his responsibility for Gabrielle. Specifically, the trial justice found that, after the death of Gabrielle's mother, Armand resumed using drugs while he turned Gabrielle over to his niece to care for the child. The trial justice further stated that Armand's only efforts have been to say: "I want my child."

The trial justice then found that, "[b]ased upon all of the evidence" the state had proven its case by clear and convincing evidence as to each and every one of its allegations. The trial justice continued by stating that he did "not see how [it would be] possible for [DCYF] to provide any further services to [Armand], considering all the circumstances." The trial justice determined that it was in the best interest of Gabrielle that Armand's parental rights be terminated, and he proceeded to do so.

On October 26, 2010, the termination of parental rights decree was entered. In the findings of facts that are set forth in the decree, it is stated that "the DCYF Social Caseworker made reasonable efforts to ensure that [Armand] was engaging in reunification services." Based on the rather sparse findings of fact in the decree, the trial justice ordered, adjudged, and decreed: (1) "That the [s]tate has proved by clear and convincing evidence that [Armand] is unfit by reason of conduct or

conditions seriously detrimental to * * * Gabrielle, in that she has been placed in the legal custody of [DCYF], and [that Armand] has a chronic substance abuse problem," the prognosis concerning which indicates that Gabrielle "would not be able to return to the care of [Armand] within a reasonable period of time, given [her] age and need for a permanent home;" (2) "That [Armand] is unfit in that [Gabrielle] has been in the legal custody or care of [DCYF] for at least 12 months and that [Armand] was offered or received services to alleviate the situation that led to the child being placed, and that further, despite that it continues to be unlikely that the child would be able to return to [his] care * * * within a reasonable period of time, given [her] age and need for a permanent home;" (3) "That [Armand] is unfit in that he has exhibited behavior that is seriously detrimental to the child of such a duration so as to render it improbable that [he] would be able to care for [Gabrielle] within a reasonable period of time, given [her] age and need for a permanent home" and; (4) "That [Armand] is unfit in that he has abandoned and deserted [Gabrielle]." [12]

Armand filed a timely notice of appeal. On appeal, he argues: (1) that the trial justice committed reversible error in finding that DCYF made reasonable efforts to reunify Gabrielle and him; (2) that the trial justice erred in finding support in the record for the conclusion that Armand had abandoned Gabrielle; (3) that the trial justice made no factual findings as to his conclusions that Armand had a substance abuse problem that prevented reunification and that Armand had exhibited behavior or conduct that was seriously detrimental to Gabrielle of such duration as to render it improbable for him to care for Gabrielle for an extended period of time; and (4) that the evidence presented at the hearing

---

**12.** Though sparse, the trial justice's conclu- sions were sufficient.

failed to support the just-mentioned allegations by clear and convincing evidence.

## II

## Standard of Review

In reviewing a decree terminating parental rights, this Court will "examine[ ] the record to determine whether legally competent evidence exists to support the findings of the trial justice." *In re Natalya C.*, 946 A.2d 198, 202 (R.I.2008); *see also In re Caleb W.*, 990 A.2d 1225, 1228 (R.I.2010); *In re Ariel N.*, 892 A.2d 80, 83 (R.I.2006). The findings of fact made by a justice of the Family Court "are accorded great weight on appeal and will not be disturbed unless it can be shown that they are clearly wrong or the trial justice overlooked or misconceived material evidence." *In re Jose Luis R.H.*, 968 A.2d 875, 881 (R.I.2009) (internal quotation marks omitted); *see also In re Tory S.*, 988 A.2d 151, 155 (R.I.2010).

Moreover, in reviewing the " 'grave, drastic, and irreversible action' " [13] that a termination of a parent's rights constitutes, we remain mindful that "natural parents have a 'fundamental liberty interest' in the care, custody, and management of their children." *In re Steven D.*, 23 A.3d 1138, 1154 (R.I.2011); *see also Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Dayvon G.*, 10 A.3d 448, 453 (R.I.2010). It follows that a parent's fundamental interest in his or her child does not "evaporate simply because [he or she has] not been a model parent[ ] or [has] lost temporary custody of their child * * *." *Santosky*, 455 U.S. at 753, 102 S.Ct. 1388; *see also In re Nicole B.*, 703 A.2d 612, 615 (R.I.1997).

## III

## Analysis

## A

## DCYF's Efforts to Reunify Armand and Gabrielle

Armand contends on appeal that the trial justice committed reversible error in finding that DCYF made reasonable efforts to reunify Gabrielle and her father.

When it seeks to terminate parental rights, "subsequent to presenting sufficient evidence to support [a finding of parental unfitness], DCYF must additionally demonstrate to the Family Court that it has made reasonable efforts to strengthen the parent-child relationship in accordance with the provisions of § 15–7–7(b)(1)." [14] *In re Brooklyn M.*, 933 A.2d 1113, 1125 (R.I.2007); *see also In re Steven D.*, 23 A.3d at 1156; *In re Jose Luis R.H.*, 968 A.2d at 882. In addition, when DCYF attempts to terminate parental rights pursuant to § 15–7–7(a)(3), which requires that the child has been placed in the legal custody or care of DCYF for at least twelve months, the parent must be offered or receive services to correct the

13. *In re Kayla N.*, 900 A.2d 1202, 1210 (R.I. 2006) (quoting *Lowe v. Department of Public Welfare of Richmond*, 231 Va. 277, 343 S.E.2d 70, 72 (1986)).

14. The statutory provision that is referred to in the text reads as follows:

"In the event that the petition is filed pursuant to subdivisions (a)(1), (a)(2)(i), (a)(2)(iii), or (a)(2)(vii) of this section, the court shall find as a fact that, prior to the granting of the petition, such parental conduct or conditions must have occurred or existed *notwithstanding the reasonable efforts which shall be made by the agency* prior to the filing of the petition to encourage and strengthen the parental relationship so that the child can safely return to the family." G.L.1956 § 15–7–7(b)(1) (emphasis added).

situation which led to the child being placed.[15]

■ As a result of both that statutory mandate and the need to protect the parent's fundamental liberty interest in the care, custody, and management of his or her child, "DCYF [must] prove, by clear and convincing evidence, that it made reasonable efforts to encourage and strengthen the parental relationship prior to filing a TPR petition." *In re Natalya C.*, 946 A.2d at 203; *see also In re Jose Luis R.H.*, 968 A.2d at 882. The criterion of "reasonable efforts" is "subject to a case-by-case analysis [that takes] into account, among other things, the conduct and cooperation of the parents." *In re Nicole B.*, 703 A.2d at 618; *see also In re Natalya C.*, 946 A.2d at 203. Moreover, in our consideration of whether or not DCYF has made reasonable efforts, we employ a "totality of the circumstances approach," pursuant to which "the efforts required from DCYF to satisfy the reasonable efforts standard vary with the differing capacities of the parents involved." *In re Kayla N.*, 900 A.2d 1202, 1209 (R.I.2006) (internal quotation marks omitted).

We have recognized, however, that, even when DCYF has made the required reasonable efforts, reunification may not always be possible. For that reason, provided that reasonable efforts have been made, "we do not fault the agency when the treatment received does not resolve the underlying problem or when a parent's recalcitrance to treatment precludes reunification." *In re Natalya C.*, 946 A.2d at 203; *see also In re Jose Luis R.H.*, 968 A.2d at 882 (stating that DCYF "need not undertake extraordinary efforts to reunite

parent and child" (internal quotation marks omitted)).

### 1. The Requirement of Reasonable Efforts to Reunify Gabrielle and Armand

■ It is of significance to note that DCYF need not be the sole provider of the necessary services to the parent(s); we have expressly indicated that "the services may be offered by the agency *or received elsewhere*." *In re Natalya C.*, 946 A.2d at 203 (emphasis added); *see also In re Steven D.*, 23 A.3d at 1156 (stating that DCYF must ensure that services are offered or received). However, regardless of whether the services are offered by DCYF or provided by another source, it is well established that such services "must be offered or received, regardless of the unlikelihood of their success." *In re Natalya C.*, 946 A.2d at 203 (internal quotation marks omitted); *see also* § 15–7–7(a)(3); *In re Steven D.*, 23 A.3d at 1156.

■ For example, in *In re Natalya C.*, 946 A.2d at 203–04, DCYF was not required to provide additional drug counseling to the parent because she had been independently receiving substance abuse treatment from the time her daughter was initially removed from her care until the filing of the petition to terminate parental rights. Similarly, in the instant case, DCYF was not required to provide additional substance abuse counseling to Armand—since he had already been receiving such counseling from Becky Chartier of NRI Community Services since July of 2008.

Elsewhere in our opinion in *In re Natalya C.*, 946 A.2d at 204, however, we stated that it was "wholly unreasonable" for

---

**15.** Although § 15–7–7(b)(1) does not specifically list § 15–7–7(a)(3) as a provision to which it applies, we have held that a termination under the latter subsection also requires the showing of reasonable efforts as is required under the subsections specifically mentioned in § 15–7–7(b)(1). *See In re Jose Luis R.H.*, 968 A.2d 875, 882 (R.I.2009).

DCYF not to include any mental health treatment in the parent's case plan because her mental illness was one of the primary barriers to her reunification with her daughter. Moreover, in that case, her caseworkers either knew in fact, or should have known, about the concerns of the mother's drug counselor concerning the "paralyzing effects" of her depression and her "high risk for relapse." *Id.*[16]

The circumstances in the instant case are readily distinguishable from those relative to mental health treatment in *In re Natalya C.*—because Armand was receiving mental health treatment from Mr. Petrin. We consider it significant that, in the three years prior to trial, Louis Petrin of NRI Community Services had been working with Armand concerning his depression, his substance abuse issues, and his cognitive impairment. DCYF was aware that Armand had sought and was regularly receiving those services to remedy both his substance abuse and his mental health issues. Indeed, Laura Nevins of DCYF testified that she did not make any referrals for Armand because he was making them on his own. Moreover, it was Ms. Nevins's testimony that she requested and received a report concerning Armand's mental health treatment from his NRI Community Services clinician. Accordingly, in the present case, it was not necessary for DCYF to provide duplicative services to a parent who was already "receiv[ing] services to correct the situation which led to the child being placed." *See* § 15–7–7(a)(3).

## 2. Reasonable Efforts Need Not Be Extended Without Limit

 This Court has had occasion to indicate that "[t]here must be a limit to the extension of reasonable efforts." *In re Kayla N.*, 900 A.2d at 1209 (alteration in original) (internal quotation marks omitted). Additionally, in our assessment of the reasonable efforts of DCYF, "we look also to the conduct and cooperation of the parents." *In re Jose Luis R.H.*, 968 A.2d at 883; *see also In re Natalya C.*, 946 A.2d at 203; *In re Nicole B.*, 703 A.2d at 618.

In the instant matter, the DCYF caseworker (Ms. Nevins) created case plans every six months and attempted to work with Armand with respect to those plans. However, although Armand was involved with the first case plan, it was Ms. Nevins's testimony that thereafter Armand "was homeless and not available, or did not want to speak with [her]." Moreover, Ms. Nevins would contact Mr. Petrin when she needed to get in touch with Armand, but was unable to reach Armand himself. Therefore, due to the fact that Armand often could not be reached, Ms. Nevins was unable to engage in case planning with him. It was also Ms. Nevins's testimony that Armand had been inconsistent with respect to visitation.

At the time of trial, Armand had also been receiving counseling for both his substance abuse and mental health issues. According to Dr. Parsons, NRI Community Services (which provided Armand with counseling with respect to those issues) strongly recommended that Armand not be reunified with Gabrielle because, in its view, Armand was unable to provide for her physical, developmental, or emotional needs.

In view of the foregoing findings of fact that are supported in the record, we perceive no basis for holding that the trial

**16.** *See also In re Steven D.,* 23 A.3d 1138, 1157 (R.I.2011) (criticizing DCYF's failure to refer the mother for substance abuse treatment, despite the recommendation of an evaluating psychologist and the continued belief of three of her caseworkers that her substance abuse was "a primary barrier to reunification").

justice clearly erred in concluding that DCYF's efforts to strengthen the parent child relationship were reasonable.

## B

## Armand's Further Contentions on Appeal

As previously noted (see section I B of this opinion, *supra*) Armand has challenged on appeal several other determinations by the trial justice—all of which involve statutory provisions other than § 15–7–7(a)(3). However, in view of our holding that the trial justice did not clearly err with respect to the "reasonable efforts" requirement[17] under § 15–7–7(a)(3), we need not and therefore shall not address those other claims of error. *See, e.g., In re Julian D.*, 18 A.3d 477, 486 (R.I.2011); *In re Dayvon G.*, 10 A.3d at 456; *In re Ariel N.*, 892 A.2d at 86.

## IV

## Conclusion

For the foregoing reasons, we affirm the judgment of the Family Court terminating the parental rights of the respondent. The record may be returned to that tribunal.

Justice GOLDBERG, concurring.

I concur in the majority's decision in this case. I write separately, however, because the result, as well as the Court's reasoning

in reaching this result, stands in sharp contrast to *In re Steven D.*, 23 A.3d 1138 (R.I.2011)—the Court's last pronouncement on the question of the quantum of reasonable efforts at reunification required of the state to sustain a decree ordering the termination of parental rights.

In *In re Steven D.*, a majority of this Court vacated a decree terminating the parental rights of a mother who, despite attending two or more meetings of Alcoholics Anonymous weekly, appeared at supervised visits reeking of alcohol,[18] acted aggressively toward caseworkers, lost the services of three parental aides who refused to continue working for the family, and appeared in the Family Court obviously under the influence of alcohol.[19] In *In re Steven D.*, 23 A.3d at 1144–45, DCYF prepared no less than four case plans, each articulating the stated goal that the parents should maintain a substance-abuse-free lifestyle—which included utilizing "a network of 'clean and sober supports such as church, AA/NA, and community providers,'" *id.* at 1142, as well as anger management counseling at Family Resources, and the services of the four parent aides.[20] A majority of the members of this Court vacated the decree terminating the mother's parental rights for the primary reason that the mother never was offered alcohol counseling, notwithstanding that she regularly was attending AA and failed to acknowledge her alcoholism at any point in that long, drawn-out saga.[21]

---

**17.** *See* footnote 15, *supra*, and accompanying text.

**18.** At one such visit, the mother told the DCYF case worker, "I said I wouldn't show up to visits drinking. I never said I wouldn't show up drunk." *In re Steven D.*, 23 A.3d 1138, 1146 (R.I.2011).

**19.** Her defense consisted of a declaration that she consumed only a six-pack of beer the previous evening.

**20.** Three parent aides refused to provide services to the parents based on their lack of cooperation, and the fourth left the agency. *In re Steven D.*, 23 A.3d at 1146.

**21.** The respondent mother in *In re Steven D.* also was referred for domestic violence and mental health counseling, but was unsuccessful and uncooperative at both. Moreover, both parents were referred to NRI Community Services for substance abuse evaluations, the same agency that provided services to the

I contrast the holding in *In re Steven D.* with the case on appeal—one of the very next cases of termination of parental rights in which the adequacy and reasonableness of the efforts made by DCYF is challenged. In this case, virtually no services were *offered* by DCYF to the respondent father, yet this Court upholds the termination decree—correctly, I conclude—because the father independently was receiving counseling for his psychiatric and substance abuse problems from NRI Community Services—sadly, to no avail. Significantly, no parenting classes, counseling services, or other assistance were offered to this respondent by DCYF.

In this case, the Court, appropriately I believe, anchors its conclusion that the prerequisite of reasonable efforts was satisfied, not on the basis that the services were offered or provided by DCYF, but rather, on our well-settled law that the services need not be offered by DCYF if they are obtained elsewhere. Here, DCYF acknowledged, and this Court recognized, that DCYF did not make any referrals for the father because he was receiving counseling on his own. In light of the disconnect between *In re Steven D.* and our holding in this case, and my firm conviction that obtaining counseling services from an entity other than DCYF—including twelve-step programs, such as AA, and church-based groups—satisfies the statutory requirement of reasonable efforts, hopefully *In re Steven D.* will be limited to its own sad facts.

respondent father in the case at bar. Those evaluations concluded that neither parent had a substance abuse problem at that time. *In re Steven D.,* 23 A.3d at 1142.