**Supreme Court**

No. 2014-312-Appeal.
(12-4079-1)

In re Max M.                              :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Supreme Court

No. 2014-312-Appeal.
(12-4079-1)

In re Max M.                  :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Robinson, for the Court.** On August 21, 2014, a Family Court decree entered which terminated the parental rights of the respondent father, Eric M.,[1] with respect to his son, Max M. On appeal, Eric argues that the record lacks clear and convincing proof of: (1) his unfitness as a parent; and (2) the reasonable efforts of the Department of Children, Youth and Families (DCYF) to reunify Eric with his son. This case came before the Supreme Court for oral argument pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After considering the record, the memoranda submitted by the parties, and the oral arguments of counsel, we are satisfied that cause has not been shown and that this appeal may be decided without further briefing or argument. For the reasons set forth in this opinion, we affirm the judgment of the Family Court.

---

[1] We refer to respondent by his first name; in so doing, we intend no disrespect. See In re Gabrielle D., 39 A.3d 655, 657 n. 1 (R.I. 2012).

- 1 -

## Facts and Travel

On September 13, 2013, DCYF filed a petition to terminate the parental rights of Eric with respect to his son, Max (born in August of 2011).[2]  In its petition, DCYF alleged the following grounds for the termination of Eric's parental rights: (1) Max had been placed in the legal custody of DCYF "for at least twelve (12) months * * * [without] a substantial probability that the child [would] be able to return safely to [Eric's] care within a reasonable period of time" pursuant to G.L. 1956 § 15-7-7(a)(3); and (2) Eric's abandonment or desertion of Max pursuant to § 15-7-7(a)(4).

A trial was held before a justice of the Family Court on May 5 and May 12, 2014, during which the trial justice heard testimony from the following witnesses: Cheryl Csisar, a DCYF caseworker who was assigned to Max's case; Eric; and Susan Carlson, a DCYF casework supervisor who supervised both Cheryl Csisar and her predecessor, Nicole Guglielmetti.  We summarize below the salient aspects of that testimony.

### A

### The Testimony of Cheryl Csisar

Cheryl Csisar testified as a witness for DCYF.  She stated that she became responsible for Max's case in June of 2013, after Nicole Guglielmetti, the original caseworker, departed.

---

[2]    DCYF simultaneously filed a petition to terminate the parental rights of Max's mother, Amanda M. (who is also Eric's wife), on the same grounds that it relied upon in seeking to terminate the parental rights of Eric.  In addition, DCYF cited Amanda's unfitness by reason of chronic substance abuse as grounds for termination of her parental rights pursuant to G.L. 1956 § 15-7-7(a)(2)(iii).  Amanda failed to appear for the initial hearing on the petition and was defaulted.  Subsequently, her parental rights were terminated, and she did not appeal from that determination.

Ms. Csisar described in her testimony how Max came to be placed with DCYF. She stated that, in May of 2012, DCYF was notified about "child care concerns" with respect to Max because his mother, Amanda, was "abusing heroin * * * [and] leaving [Max] with relatives for extended periods of time and not providing for his care." Ms. Csisar further testified that, at the same time, Eric was "unable to care for his son as well because he was already serving time at the [Adult Correctional Institutions (ACI)] for breaking and entering * * *."[3] She testified that, on May 23, 2012, Max was placed in foster care with his maternal aunt and uncle and that he had remained in their care since that time.

Ms. Csisar next testified that her predecessor at DCYF, Nicole Guglielmetti, had created two case plans for Eric, each with the goal of reunification. Ms. Csisar further testified that, in July of 2013, soon after she took over Max's case and approximately a month after Eric's release from the ACI (in June of 2013), she created a third case plan for Eric in pursuit of the same goal. It was Ms. Csisar's testimony that the just-referenced case plan contained expectations that Eric develop parenting skills, attend substance abuse treatment programs, address anger management issues, obtain housing, and refrain from "any and all" illegal activities. She added, however, that she was unable to take any further steps with Eric in terms of executing that case plan because she and Eric "had several discussions about the case planning, and [Eric] felt because he completed some programs at the ACI that he didn't need to do any further case planning upon his release * * *." Ms. Csisar specifically stated: "[Eric] had informed me that he completed a parenting program at the ACI * * * and he said he also attended an anger management group * * *."

---

[3] According to Eric's filing before this Court, he was incarcerated at the ACI for a period of sixteen months, beginning on February 2, 2012 and ending on June 7, 2013. Ms. Csisar also testified to at least two other sentences that Eric served at the ACI, including one for felony assault with a dangerous weapon and another for felony shoplifting.

With respect to the anger management program in which Eric participated at the ACI, Ms. Csisar stated that "anybody could go to a group." She added that she would "still need a therapist, a qualified professional[,] to tell [her that Eric had] learned something and mastered some skill and ability to cope in life." Similarly, with respect to the parenting program in which Eric participated at the ACI, she testified that the course was not sufficient; she stated: "[Eric] has to be able to demonstrate * * * change, and I never saw during my visits with him and his son [that he demonstrated] any parenting abilities. So he would have needed much more than just that class that he attended." In addition, Ms. Csisar testified that Eric told her that "when the child comes home to his care * * * his wife [(whose parental rights had been terminated)] and his family members would take care of the child; that he didn't feel like he was going to be the primary caretaker."

With respect to Eric's efforts in connection with other aspects of the case plan, Ms. Csisar testified that, while the home in which Eric lived would be "suitable" for a child to reside in, Eric's wife Amanda (Max's mother), who also lived in the home, would not be "an appropriate caretaker for Max," in light of the fact that her parental rights to the child had been terminated. Later in her testimony, Ms. Csisar acknowledged that, because Amanda lived in the home, the housing situation would not in fact be adequate for Max. Furthermore, Ms. Csisar testified that, when she visited, in March of 2014, the home where Eric lived with his wife and grandmother, "[e]verything really felt stone cold;" she further stated that "there was no heat * * * or hot water" available in the home.

It was also Ms. Csisar's testimony that, since Eric's release from the ACI in June of 2013, he "had the opportunity to visit with his son weekly[.]" However, it was her further testimony that, from the time of Eric's release from the ACI until the time of the trial, which took

place in May of 2014 (a time period of eleven months), there had been a total of five visits between Eric and Max, all of which took place at McDonald's fast-food restaurants.[4] The last visit between Eric and his son was in January of 2014. Ms. Csisar added that Eric had never requested that the frequency or the one-hour length of the visits be increased, nor had he ever requested make-up visits. Moreover, when asked whether she knew why Eric had not seen Max since January of 2014, Ms. Csisar referenced the fact that she would "call and * * * call [Eric] and his phone gets shut off, and the voicemail is never set up." Ms. Csisar added that then she would try calling the house phone number and that she would "call there and leave messages to his wife and his grandmother," but that she would never receive a response from Eric.

Ms. Csisar testified that, during visits between Eric and his son, she observed that Max "really doesn't know [Eric];" she added that Max "sometimes cries when he has to get out of the van and leave his foster mother [Max's maternal aunt]." She added that, although she did recall that Eric gave Max "a gift and * * * a game, a toy or something" and that he fed Max during their visits, she had also noted that, when Max would "fuss[]," Eric would get "flustered;" she further commented that "he doesn't know what to do." Ms. Csisar testified that Eric "looked very uncomfortable, like he [did not] know what he [was] doing, how to care for [Max] * * *." Ms. Csisar also stated that, during visits, Eric would not check Max's diaper; she added that Eric "feeds [Max] and then he leaves."

It was also Ms. Csisar's testimony that she had several conversations with Eric regarding the termination of his parental rights. She first testified that, when she informed Eric that DCYF had filed the petition for termination of parental rights, he was "very angry about it." Ms. Csisar further testified that, in March of 2014, she attempted to meet with Eric to have him sign some

---

[4] Ms. Csisar did note on the record that Eric had been available for one additional visit, which she had to cancel as a result of illness on her part.

paperwork concerning a special education evaluation for Max. She stated that she went to the home of Eric's grandmother, where Eric lived, and she happened upon Eric there. Ms. Csisar testified that Eric signed the necessary paperwork, and she summarized as follows what Eric said at that point:

> "[H]e said to me that he decided he knew he couldn't parent and that he just wanted to sign the direct consent [adoption]. He did not want to go forward with the trial. That he knew there was no point in it. That he felt he would lose and that he couldn't parent."

In sum, Ms. Csisar testified that, in her opinion, Eric did not successfully meet the goals of the case plan that had been created in July of 2013. She added that, around October of that year, after the filing by DCYF of a petition for the termination of Eric's parental rights, a new case plan—with the goal of adoption—was undertaken. Ms. Csisar further testified that Max was "doing very well" in his placement at his maternal aunt's home and that Max was "very bonded" and "very healthy and happy." She added that Max's placement in that home was considered a pre-adoptive placement, and that Max's aunt and uncle had expressed a willingness to adopt Max if Eric's parental rights were terminated.

On cross-examination, Ms. Csisar admitted that she did not call the facilitators of the programs attended by Eric at the ACI in an attempt to ascertain whether they met DCYF standards. She also conceded that she did not make any referrals for any services for Eric. However, Ms. Csisar testified on redirect examination that she had never, in any of her cases, called the ACI and inquired about the curricula relative to the various programs offered at that facility. With respect to the fact that she did not make any referrals for Eric, Ms. Csisar stated on redirect examination that she did tell Eric that he needed additional anger management classes and parenting classes and that he responded that he did not view such classes as necessary. It was her testimony that she would not make a referral for someone who did not want one.

## The Testimony of Eric M.[5]

Eric was also called as a witness during DCYF's presentation of its case. (The trial justice granted DCYF permission to treat him as a hostile witness approximately halfway through his testimony.) Although Eric was incarcerated at the time of trial, he stated that he was living with his wife, Amanda. Eric then testified with respect to the case plan given to him by DCYF. He stated that the goals of his case plan were discussed with him while he was incarcerated at the ACI (from February of 2012 to June of 2013) and that those goals were "reunification, drug counseling and visits." His testimony then turned to the most recent case plan (the third) developed for him by Ms. Csisar and the various requests made by DCYF with respect to achieving his case plan goals after his release from the ACI.

Eric testified that DCYF requested that he attend a parenting class, and he stated that he "did that while [he] was in jail." When asked whether he was told by DCYF that the parenting class that he completed while at the ACI was not sufficient, Eric did not directly answer the question, but instead responded: "Why isn't it sufficient, though?" He also stated: "I'm not going to give you the answer you want"—at which point, the trial justice allowed DCYF to treat Eric as a hostile witness. Eric continued his testimony, stating that he did not take any parenting class beyond the one offered by the ACI "[b]ecause [he] felt [he] already did the class that [he] already did." He again asked: "What's the problem with the class that I took?"

Similarly, Eric also testified that he did not recall whether or not he was asked by DCYF to attend domestic violence counseling; he added that, regardless, he felt that domestic violence was not "something [he] currently [had] a problem with in [his] life." Eric further testified that

---

[5]     Eric was being detained at the ACI on a warrant at the time of his testimony (May 12, 2014).

he was asked by DCYF to attend anger management counseling.  Significantly, when asked what he had done with respect to obtaining custody of his son, Eric's blunt answer was: "Nothing." Eric further testified that DCYF asked him to complete a substance abuse program, which he had not done, although he stated that he was at that time in a substance abuse program at the Kent Center.

It was Eric's further testimony that, since the time that Max had been in DCYF care, he had not provided financially for his son.  He also conceded that he had not called the caseworker on a weekly basis to see how his son was doing.  With respect to visits with Max, Eric testified that, when he was released from the ACI in June of 2013, he wanted to "make sure [he] was stable" before he visited with Max for the first time after his release; he cited that as the reason why his first visit with his son did not occur until August of 2013, nearly two months after his release.  He also stated that, at the time of trial, he was not sure when was the last time that he had visited with his son Max.  Eric testified that he believed that it was "over a month ago" or perhaps "two months ago."

Eric also testified with respect to statements that he made to Ms. Csisar concerning his willingness to sign a direct consent adoption for Max.  It was Eric's testimony that, at the time that he spoke to Ms. Csisar about the subject, he "had a bunch of mixed feelings about what was going on in this case;" he added that, although he may have been willing to sign a direct consent adoption at the time, "nothing was set in stone."

On cross-examination by his own counsel, Eric offered two exhibits in support of his testimony that he attempted to cooperate with the case plan while incarcerated—viz., a certificate evidencing completion of a program entitled "Cognitive Reconstruction/Anger Management" and a certificate evidencing completion of a program entitled "Parenting Inside Out."  He also

- 8 -

testified that he had completed a domestic violence program and another anger management program while at the ACI; he did not provide certificates evidencing his participation in the latter two programs during his testimony before the Family Court.[6] Eric also admitted that he received "good time" credit as a consequence of the completion of each class that he took, but he added that receiving a sentence reduction "wasn't the motivation" for his enrollment and completion of those courses.

## C

### The Testimony of Susan Carlson

The final witness called by DCYF was Susan Carlson. Ms. Carlson testified that she was a casework supervisor for DCYF and had held that position for twelve years. She stated that she supervised Nicole Guglielmetti, the initial social caseworker in Max's case, as well as Cheryl Csisar, the caseworker who took over when Ms. Guglielmetti departed.

Ms. Carlson testified that she reviewed Max's file to determine whether Eric had "successfully completed any of the case plan goals or tasks[.]" She described the materials that she reviewed as follows:

> "I reviewed the case activity notes that were entered during the time of Nicole working with the family, as well as court letters and court documents, the summary of facts for the original petition [for termination of parental rights], and the termination petition."

Ms. Carlson testified that she also discussed with Ms. Csisar whether or not the parents had successfully completed any of the tasks in their case plan. She stated that, after she had undertaken those steps, her review of the file indicated that Eric had not completed the necessary tasks in his case plan.

---

[6] After being granted leave by this Court to supplement the appellate record, Eric did later provide evidence that he completed the courses, entitled "Domestic Violence Prevention Group" and "Learning to Live Initiative: Anger Management."

# D

## The Trial Justice's Decision

After the testimony of the three just-referenced witnesses, DCYF rested its case, and respondent then rested without presenting any witnesses. In July of 2014, the trial justice issued a written decision, including twenty-eight separate factual findings, culminating in the conclusion that Eric was unfit to parent Max.[7] (We shall delve further into several details contained in those findings in Part IV, infra.) On August 21, 2014, a final decree entered terminating Eric's parental rights. A timely appeal ensued.

# II

## Standard of Review

We have long held that "[n]atural parents have a fundamental liberty interest in the 'care, custody, and management' of their children." In re Jazlyn P., 31 A.3d 1273, 1279 (R.I. 2011) (quoting Santosky v. Kramer, 455 U.S. 745, 753 (1982)); see also In re Gabrielle D., 39 A.3d 655, 666 (R.I. 2012). Accordingly, it is important to remain "mindful that that fundamental interest does not evaporate simply because [the natural parents] have not been model parents or have lost temporary custody of their child." In re Steven D., 23 A.3d 1138, 1154 (R.I. 2011) (internal quotation marks omitted). To that end, we have acknowledged that, "[a]bsent a finding of unfitness, the natural parents [sic] right to bear and raise their child in a less than perfect way remains superior to the rights of foster parents who may be exemplary nurturers." In re Amber P., 877 A.2d 608, 615 (R.I. 2005) (internal quotation marks omitted). We recognize that, in light of the "drastic and irreversible" nature of a decree terminating parental rights, "due process requires that, before the state may terminate a parent's rights in his or her children, the state must

---

[7] The trial justice did not address the alternate ground for termination that was set forth in DCYF's petition—viz., abandonment.

support its allegations <u>by</u> <u>clear</u> <u>and</u> <u>convincing</u> <u>evidence</u>." <u>In re Steven D.</u>, 23 A.3d at 1154, 1155 (emphasis in original).

We bear in mind these weighty considerations in our review of a decree terminating parental rights, while also acknowledging that "[t]he findings of fact made by a Family Court justice in this context are accorded great weight on appeal and will not be disturbed unless it can be shown that they are clearly wrong or the trial justice overlooked or misconceived material evidence." <u>In re Caleb W.</u>, 990 A.2d 1225, 1228 (R.I. 2010) (internal quotation marks omitted). That deferential standard of review requires only that we determine "whether any legally competent evidence exists to support the trial justice's findings." <u>In re Robert S.</u>, 840 A.2d 1146, 1149 (R.I. 2004) (internal quotation marks omitted). We have established that, in order to make this determination, it is appropriate for this Court to engage in a three-step analytical process, which we have described as follows:

> "[W]e (1) examine the trial justice's finding of parental unfitness; (2) review the finding that reasonable efforts at reunification were made by the state agency charged with that duty; and (3) review the finding that termination is in the children's best interests." <u>In re Steven D.</u>, 23 A.3d at 1155.

With the foregoing standards in mind, we turn to the merits of the instant appeal.

### III

### Issues on Appeal

On appeal, Eric contends that the trial justice erred in finding that DCYF had proven, by clear and convincing evidence: (1) that Eric was unfit to parent Max; and (2) that DCYF had made reasonable efforts at reunification between Eric and Max. We note that Eric has presented no argument to this Court with respect to whether or not DCYF had proven, by clear and

convincing evidence, that the termination of Eric's parental rights was in the best interests of the child.

## IV

## Analysis

## A

## Finding of Parental Unfitness

This Court has long held that, before parental rights may be terminated, a specific finding of parental unfitness must be made. See In re Amber P., 877 A.2d at 615; see also In re Steven D., 23 A.3d at 1161. In order to properly assess the findings of a trial justice with respect to parental unfitness, we begin by acknowledging the principle that "a parent whose child is in the care of DCYF has an obligation (1) to maintain contact with the child and (2) to plan for the child's future." In re Rosalie H., 889 A.2d 199, 205 (R.I. 2006) (internal quotation marks omitted). We have further stated that "a parent's lack of interest in his or her child evidenced by an unwillingness to cooperate with DCYF services can be a basis for a finding of unfitness." Id.; see also In re Robert S., 840 A.2d at 1149; In re Anthony M., 773 A.2d 878, 881 (R.I. 2001) (holding that the trial justice did not err in finding parental unfitness on the part of a mother where she "demonstrated a fundamental unwillingness and/or inability to participate in the plethora of services provided to her").

In the instant case, we first note that the trial justice made several specific findings in support of her conclusion that Eric is unfit to parent Max. For example, the trial justice found that Eric "refused to cooperate with case planning" and instead continued to state that he did not require any further programs in anger management or parenting because he had taken courses in those subjects while at the ACI. As we have previously stated, a refusal to cooperate with case

planning can evidence a parent's lack of interest in a child and, as such, can serve as a basis for a finding of parental unfitness. See In re Rosalie H., 889 A.2d at 205. Accordingly, we agree with the trial justice's findings with respect to Eric's lack of cooperation with the case plan developed by DCYF as constituting an adequate indication that Eric is unfit to parent Max.

While acknowledging that comparisons in this realm are inherently imperfect, we nonetheless view Eric's behavior in this case as comparable to that of the parents whose rights were at issue in In re Rosalie H., wherein we affirmed a decree terminating parental rights after recognizing that the parents' continual "refusal to engage in evaluations or participate in recommended treatment was the sole cause of the lack of success in reunifying this family." In re Rosalie H., 889 A.2d at 205, 210 (internal quotation marks omitted). Here, the record indicates that Eric consistently refused to participate in recommended programs—including, most distressingly, parenting programs—because, according to his own testimony, he "did that" while he was in prison. Moreover, according to Ms. Csisar's testimony, Eric expressly admitted that he did not plan to be Max's primary caretaker.[8]

In a similar vein, Eric's behavior is comparable to that of the respondent father in In re Robert S., 840 A.2d at 1150. In that case, we upheld the termination of parental rights in view of findings by the trial justice that the father had failed to comply with two case plans; had failed to provide "an appropriate place to reunite with the children;" and had not cooperated with DCYF's recommendation that he receive "additional parental [aid] services." Id. at 1149-50. That case constitutes a clear parallel to the instant case, in which the trial justice made explicit factual findings with respect to Eric's "refusal to engage in further services" through DCYF and his

---

[8] It should be recalled that Ms. Csisar testified that Eric told her that his wife and his "family members," presumably including his elderly grandmother, would serve as the primary caretakers for Max. It should also be recalled that the parental rights of Eric's wife as to Max had been terminated. See footnote 2, supra.

"refus[al] to take any further steps to complete his case plan goals." In a further similarity to the situation in In re Robert S., the trial justice said of Eric's housing situation that he was "currently living with [Max's] [m]other, whose parental rights over Max have been terminated;" the trial justice also noted that, during a visit by a DCYF caseworker, the house "had no heat or hot water."

In addition to pointing to evidence that Eric refused to cooperate with DCYF, the trial justice made further findings in support of her conclusion that Eric is unfit to parent Max. She cited Eric's "inconsistent and infrequent visits with Max; his failure to support Max emotionally or financially; * * * his lack of interest in Max's well-being; and his intent to allow [Amanda], whose parental rights over Max have been terminated, to be Max's primary caretaker" as evidence that Eric did not have "the desire or ability to keep and care for Max." She also found that Eric "admitted that since his initial release from the ACI in June, 2013, he has done nothing to work towards reunification with Max." It is virtually self-evident that, as was the case in In re Robert S., 840 A.2d at 1149-50, those facts, based on undisputed testimony, constitute clear and convincing evidence to support the trial justice's finding of parental unfitness on Eric's part "based on his overall lack of interest" in his child. Accordingly, we hold that the trial justice was not clearly wrong, nor did she overlook or misconceive material evidence, in finding Eric unfit to parent Max.

**B**

**Finding of Reasonable Efforts at Reunification**

This Court has previously stated that, "[w]hen [DCYF] seeks to terminate parental rights, subsequent to presenting sufficient evidence to support [a finding of parental unfitness], DCYF must additionally demonstrate to the Family Court that it has made reasonable efforts to

strengthen the parent-child relationship in accordance with the provisions of § 15–7–7(b)(1)."[9] In re Gabrielle D., 39 A.3d at 665 (internal quotation marks omitted). Moreover, we have recognized that "[w]hat constitutes reasonable efforts will vary with the differing capacities of the parents involved, and it is determined by looking at the totality of the circumstances of each case." In re Steven D., 23 A.3d at 1156 (internal quotation marks omitted). Furthermore, this Court has noted that the "reasonable efforts" standard is a subjective one and that it is "subject to a case-by-case analysis," id. (internal quotation marks omitted), taking into account, among other things, "the conduct and cooperation of the parents." In re Gabrielle D., 39 A.3d at 667 (internal quotation marks omitted).

We have more specifically described as follows what DCYF must point to as being demonstrative of reasonable efforts at reunification: "[T]he department must show that it has satisfied certain requirements, including case planning with the parent, arrangements for visitation, and keeping the parent informed of the child's well-being." In re Lyric P., 90 A.3d 132, 141 (R.I. 2014) (internal quotation marks omitted). And while we have held that "such services must be offered or received, regardless of the unlikelihood of their success," we have stated that we will not lay blame at the agency's feet in a case in which "the treatment received

---

[9]     The full text of the cited statutory provision, § 15-7-7(b)(1), reads as follows:

> "In the event that the petition is filed pursuant to subdivisions (a)(1), (a)(2)(i), (a)(2)(iii), or (a)(2)(vii) of this section, the court shall find as a fact that, prior to the granting of the petition, such parental conduct or conditions must have occurred or existed notwithstanding the reasonable efforts which shall be made by the agency prior to the filing of the petition to encourage and strengthen the parental relationship so that the child can safely return to the family. In the event that a petition is filed pursuant to subdivision (a)(2)(ii), (a)(2)(iv), (a)(2)(v), (a)(2)(vi) or (a)(4) of this section, the department has no obligation to engage in reasonable efforts to preserve and reunify a family."

does not resolve the underlying problem or when a parent's <u>recalcitrance</u> <u>to</u> <u>treatment</u> precludes reunification." <u>In re Natalya C.</u>, 946 A.2d 198, 203 (R.I. 2008) (emphasis added) (internal quotation marks omitted).

In the instant case, the trial justice expressly found that DCYF did engage in case planning with Eric on at least three separate occasions and that it had provided him with the opportunity for weekly visits with his son from June of 2013 through the time of trial—of which opportunity Eric availed himself only five times. Accordingly, there is sufficient evidentiary support for the trial justice's finding that DCYF had satisfactorily engaged in the efforts required by our precedent, including case planning and providing the opportunity for visits between parent and child. <u>See</u> <u>In re Lyric P.</u>, 90 A.3d at 141.

The trial justice further found that, although DCYF had not made "specific referrals for [Eric] for parenting or anger management," the decision not to make referrals was based upon the fact that Eric had "clearly and repeatedly stated that he will not engage in further programs or services to attain his case plan goals." Moreover, the trial justice found that Eric's "voluntary refusal to engage in case planning or further services make it impossible for DCYF to provide him with any services." In accord with that finding, both Ms. Csisar and Eric testified that Eric believed that he did not need any further programs such as parenting classes or anger management courses in view of the programs in which he participated at the ACI.

Eric's refusal to participate in DCYF's case plans stands in stark contrast to the facts in <u>In re Natalya C.</u>, 946 A.2d at 204, in which the respondent mother did not receive <u>any</u> mental health treatment, a service which was necessary to overcome one of her "primary barriers" to reunification with her daughter. Here, Eric was told that he needed further parenting and anger management classes, among other services. However, Eric flatly refused to engage in those

services.   In light of that fact, this <u>is</u> a case in which "a parent's recalcitrance precluded reunification."  <u>Id.</u>; <u>see</u> <u>also</u> <u>In re Rosalie H.</u>, 889 A.2d at 208 (stating that DCYF does not have the burden of "holding the hand of a recalcitrant parent") (internal quotation marks omitted). Accordingly, we perceive no basis for disturbing the finding of the trial justice that DCYF made reasonable efforts at reunification, and we hold that, on this record, there was clear and convincing evidence of the same.

## V

### Conclusion

We affirm the Family Court's judgment terminating the parental rights of the respondent. The record may be returned to that tribunal.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**       In re Max M.

**CASE NO:**              No. 2014-312-Appeal.
                        (12-4079-1)

**COURT:**                Supreme Court

**DATE OPINION FILED:**  June 4, 2015

**JUSTICES:**             Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**           Associate Justice William P. Robinson III

**SOURCE OF APPEAL:**    Kent County Family Court

**JUDGE FROM LOWER COURT**:

                        Associate Justice Sandra A. Lanni

**ATTORNEYS ON APPEAL:**

                        For Petitioner:  Karen A. Clark
                                Department of Children Youth and Families

                                Jennifer J. Kelly
                                Court Appointed Special Advocate

                        For Respondent:  Catherine Gibran
                                Office of the Public Defender