April 9, 2018

**Supreme Court**

No. 2016-295-Appeal.
(00-1831-5)
(00-1831-6)
(00-1831-7)

In re James H. et al.                    :

NOTICE:    This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

In re James H. et al.                    :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Robinson, for the Court.**  The respondent mother, Crystal M.,[1] appeals from a decree of the Family Court terminating her parental rights with respect to her three children, James H., Dalicia W., and Dalilah W.  This case came before the Supreme Court for oral argument on December 6, 2017, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After a close review of the record and careful consideration of the parties' arguments (both written and oral), we are satisfied that cause has not been shown and that this appeal may be decided at this time. For the reasons set forth below, we affirm the decree of the Family Court.

**I**

**Facts and Travel**

On October 30, 2015, the Department of Children, Youth and Families (DCYF) filed petitions to terminate Crystal's parental rights[2] as to three of her minor children:  James, Dalicia,

---

[1]     In this opinion, we shall refer to respondent by her first name; in so doing, we intend no disrespect.

[2]     The parental rights of the fathers of the children were terminated by the Family Court on July 26, 2016, and no appeal was taken therefrom.

- 1 -

and Dalilah.[3] Citing G.L. 1956 § 15-7-7(a)(3), those petitions alleged that all three children had been in the legal custody of DCYF for at least twelve months without a substantial probability that the children would be able to return safely to Crystal's care within a reasonable period of time, considering the children's ages and their needs for permanent homes.

Trial commenced in the Family Court on June 1, 2016 and continued over four days, during which time the trial justice heard testimony from eight witnesses. We summarize below the salient aspects of the testimony that was adduced at that trial.

## A

### The Witnesses Presented by DCYF

### 1. Diane Crabtree

Diane Crabtree, a social caseworker for DCYF, testified that case files as to Dalicia and Dalilah, who are twins, were opened on March 27, 2013 because both girls had tested positive for cocaine at birth.[4] She further testified that she was assigned to the cases of James, Dalicia, and Dalilah from April of 2013 until August of 2014. Ms. Crabtree stated that she developed two case plans during said period, which case plans had recommended that Crystal complete the following services in order to reunify with her children: substance abuse counseling, mental health counseling, family counseling, family visitation, parenting education, a psychological evaluation with Dr. John Parsons, and a neuropsychological evaluation with Dr. Steven Hirsch.

---

[3]     The legal status of Crystal vis-à-vis her other minor child (Eleanor S.) is not at issue in this case.  Reference is made to Eleanor in this opinion only to the extent necessary to provide context for the issues properly before this Court.

[4]     The case file as to James was opened on April 3, 2013, the date on which the child protective investigator submitted a petition to the Family Court seeking to remove James from Crystal's care based on allegations of neglect. The child protective investigator's report as to James, as well as the physician's reports finding that Dalicia and Dalilah had tested positive for cocaine at birth, were admitted as full exhibits at trial.

According to Ms. Crabtree, Crystal was cooperative with some services but uncooperative with others. She stated, for example, that Crystal successfully completed the psychological evaluation with Dr. Parsons in December of 2013 and completed the substance abuse counseling program through MAP Behavioral Health Services in May of 2014. However, she added that Crystal pursued the MAP program only after she had been discharged for noncompliance from an earlier substance abuse program, known as the "Project Link" program; and she stated that Crystal had tested positive for cocaine during her enrollment in the MAP program. Additionally, Ms. Crabtree stated that, although Crystal had participated in the Families Together parenting education program, she had been terminated from that program in March of 2014 due to a clinician's conclusion that she had demonstrated "little motivation to change her behaviors" and that, therefore, reunification would "put the children at risk."

Ms. Crabtree also testified that Crystal had failed to comply with the schedules for family visitation by virtue of her absence from eight of twenty-four scheduled visits, by her arriving late at other visits, and by her refusing to provide DCYF with her work schedule. She added that Crystal had uttered "profanities" towards DCYF employees during the visits; she also stated that Crystal had been visibly intoxicated during one of the visits and, therefore, was asked to leave. Ms. Crabtree did acknowledge, however, that, towards the end of her involvement with Crystal, she saw some improvement in Crystal's attendance at the visits and in her behavior towards DCYF employees.

### 2. Rosemary Masterson

Rosemary Masterson testified that she was the DCYF social worker who became responsible for Crystal's case after the departure of Ms. Crabtree. She stated that, when she assumed responsibility for the case in August of 2014, Crystal had completed evaluations with Dr. Parsons and Dr. Hirsch, but had not yet followed through with their recommendations or

completed the other services outlined in the case plans, such as substance abuse counseling and mental health counseling. Ms. Masterson stated that Crystal "just would not cooperate" with the objectives of the case plans, expressing the belief that "she had done everything she needed to do and no longer wished to do anymore [*sic*] services." She testified that Crystal had not been receptive to recommendations for mental health treatment because "[Crystal] didn't feel she needed counseling." She also stated that, in July of 2015, Crystal had been terminated from a second parenting education program, "the HER program," due to her "lack of progress with reunification" and her consistent failure to attend her appointments.

Ms. Masterson testified that Crystal missed twenty-seven of sixty-four scheduled visits with her children between August of 2014 and October of 2015 and that Crystal stopped attending visits altogether as of August of 2015. She further testified that Crystal's behavior towards her children during those visits was "not appropriate," specifically noting that Crystal would focus her attention exclusively on the twins while "purposely ignoring" James. She added that, at Crystal's last visit, on August 17, 2015, she had departed without speaking to the children, thereby causing the children to become "very upset." Ms. Masterson stated that, as a result of the latter incident, she filed a motion to suspend visitation, which motion was granted by the Family Court on October 26, 2015.

### 3. Doctor John Parsons

The next witness was Dr. Parsons, who was qualified as an expert in forensic psychology as well as child and family psychology. He testified that, in October of 2013, Crystal was referred to him by Ms. Crabtree for a psychological evaluation; he stated that Ms. Crabtree was concerned about Crystal's parenting ability, her history of smoking marijuana during pregnancy, her cocaine use during pregnancy, and her history of DCYF involvement. He testified that his evaluation of Crystal occurred over a series of appointments and concluded on December 16, 2013.

Doctor Parsons testified that he made the following diagnoses with respect to Crystal: "cannabis abuse in early/full remission;" "cocaine dependency in early/partial remission;" bipolar disorder; borderline intellectual functioning; and a "personality disorder with borderline narcissistic and personality disorder features." Based on his diagnoses and observations, Dr. Parsons testified that he had reached the opinion that reunification would be "high risk" and would be harmful to the children. His report recommended that Crystal should be given three months to deal with chronic mental health and substance abuse issues and to receive therapy to address both her "non-productive relationships with people" and her lack of "protective capacity" towards the children. His report further recommended that Crystal receive "a psychiatric evaluation * * * to assess the need for psychotropic medications." Doctor Parsons testified that he had recommended that the Family Court should terminate Crystal's parental rights or give her the option of an open adoption if she was unable to comply with his recommendations within the three-month timeline. Doctor Parsons having recommended that Crystal undergo a second psychological evaluation, DCYF identified Dr. Hirsch as the clinician who would conduct that evaluation.

### 4. Doctor Steven Hirsch

Doctor Hirsch, who was qualified as an expert in psychology and clinical neuropsychology, testified that he evaluated Crystal in May of 2014 pursuant to a referral from DCYF and that the focus of his evaluation was to assess Crystal's "mental health functioning, as well as her cognitive and neuropsychological functioning;" he added that his evaluation had not included an assessment of Crystal's parenting abilities. When counsel for DCYF moved to admit into evidence Dr. Hirsch's report, which summarized his findings and recommendations, Crystal's

standby counsel[5] objected, arguing that the report was not court-ordered and that, therefore, there was no foundation for the report to come into evidence. Although the trial justice initially sustained the objection, she ultimately admitted the report as a full exhibit, finding that Dr. Hirsch's evaluation and report were, in actuality, court-ordered because they were conducted in accordance with Dr. Parsons's recommendations, which were court-ordered.

Doctor Hirsch testified that he made the following diagnoses as to Crystal: cocaine abuse; daily cannabis use; post-traumatic stress disorder resulting from events in her childhood; a personality disorder; borderline intellectual functioning; and cognitive memory problems. He further testified that he had made two recommendations for further treatment: (1) that Crystal participate in outpatient counseling to address her "coping skills" and "substance abuse issues;" and (2) that Crystal engage in a "medication consultation" to determine whether psychotropic medications would help to treat her "post-traumatic stress disorder, anxiety and depression * * *."

### 5. Respondent

Crystal was the last witness to testify during DCYF's case, having been called as an adverse witness. She acknowledged that the twins had been removed from her care at birth because they had tested positive for cocaine, and she admitted that DCYF had previously indicated[6] her for neglect when her older daughter, Eleanor, had tested positive for marijuana at birth. Counsel for DCYF then asked Crystal whether she had had a second interaction with DCYF concerning Eleanor, and the following colloquy occurred:

---

[5]    Prior to the start of trial, Crystal's appointed counsel was permitted to withdraw from the case due to "a breakdown in [attorney-client] communication;" Crystal thereafter elected to proceed *pro se*. Nonetheless, she was afforded the assistance of standby counsel at trial.

[6]    "Child Protective Investigators 'indicate' a case if, upon completion of an investigation, a preponderance of the evidence demonstrates to them that a child has been abused or neglected." *In re Brooklyn M.*, 933 A.2d 1113, 1115 n.1 (R.I. 2007).

> "Q. So in 2007, you were indicated for lack of supervision as to Eleanor again, correct?
> "A. No, I never seen DCYF for Eleanor twice. It was one time.
> "Q. Didn't the Providence Police go to your home and you were arrested?
> "A. Oh, yup, yup, yup, yup, yup.
> "Q. What was that for?
> "A. That was for – –
>      [STANDBY COUNSEL]: Your Honor, objection, per Rule 609.
> "A. It was the same thing, for marijuana."

The trial justice overruled the objection, noting that counsel for DCYF was "trying to refresh her recollection about DCYF's involvement, not her arrest." After the trial justice so ruled, Crystal offered her explanation as to the circumstances of the 2007 incident.

Crystal also testified that she had never been on any medication to treat her mental health issues and that she did not feel medication was necessary; she added, however, that she had nonetheless started seeing one Earl Thurber, a counselor at "Gateway,"[7] to determine whether medication might be necessary. Crystal also testified that, contrary to what Ms. Crabtree and Ms. Masterson had stated, she had not been discharged from the Project Link substance abuse counseling program, but had left voluntarily because she was "uncomfortable there." She stated that she subsequently enrolled in the MAP substance abuse counseling program, but she acknowledged that she had tested positive for cocaine while she was enrolled in that program. Additionally, Crystal testified that her visits with her children were "good visit[s]" and that, during the visits, she would sing and play with the children. Crystal also stated that she did not voluntarily stop visiting the children in August of 2015; rather, she claimed, DCYF had asked a judge to prevent her from attending the visits.

---

[7] We infer that the "Gateway" referred to in Crystal's testimony is Gateway Healthcare, a nonprofit behavioral health organization. *See* GATEWAY HEALTHCARE https://www.gatewayhealth.org (last visited on April 6, 2018).

**The Witnesses Presented by Respondent: Valerie Khalil and Johnetta McLean**

DCYF having rested its case, Crystal called Valerie Khalil and Johnetta McLean to testify on her behalf.

Ms. Khalil stated that she had served as Crystal's sponsor in Narcotics Anonymous for three years and that she was "shocked when all this happened" because, in her opinion, Crystal was "not a drug addict."

Ms. McLean, one of Crystal's adult daughters, testified that she was not aware that her mother had ever used drugs, that she had "[n]ever been without food, clothes, anything," and that she "fe[lt] good" about her mother.

**C**

**The Trial Justice's Decision**

After reviewing the testimony and evidence, the trial justice concluded that, by clear and convincing evidence, DCYF had proven: (1) that James, Dalicia, and Dalilah had been in the legal care and custody of DCYF for at least twelve months; (2) that DCYF had made reasonable efforts to offer Crystal services to "correct the situation;" and (3) that, notwithstanding DCYF's efforts, Crystal had "failed to address her parenting and substance abuse issues, as well as her need for mental health counseling." The trial justice further found that terminating Crystal's parental rights was in the best interests of the children.

The trial justice accepted some aspects of Crystal's testimony as credible while rejecting others. Specifically, the trial justice found that there had been "a total of twelve DCYF case plans developed" to help Crystal reunify with the three children and that, even though Crystal had admitted to the allegations of neglect, she "did not cooperate with DCYF or with DCYF case plans" and had "made no progress with any of the case plan objectives." Although the trial justice

acknowledged that Crystal had successfully completed the MAP substance abuse counseling program, she also observed that Crystal had tested positive for drugs while enrolled in that program and that "[t]he MAP program [had] not recommend[ed] reunification based on [Crystal's] failure to comply with the program objectives and goals." The trial justice rejected Crystal's testimony that she had left certain DCYF-recommended programs voluntarily, finding instead that Crystal had been terminated from said programs due to her lack of progress. The trial justice further found that Crystal "did not comply with the recommendations of Dr. Parsons and Dr. Hirsch," specifically referencing Dr. Parsons's testimony that, if Crystal were unable to cooperate with the services he had recommended, "reunification would be harmful to the children." (Internal quotation marks omitted.)

In assessing the best interests of the children, the trial justice found that, at the time of trial, all three children had been placed in non-relative foster care and that each child was living in a pre-adoptive home. She added that "both twins ha[d] been placed in the same foster home, together, for most of their lives," and that James had been in a separate foster home since September of 2013, where he was "doing really well." Having found that there was "not a substantial probability that the children [would] be able to return safely to [Crystal's] care within a reasonable period of time, considering their age[s] and their need[s] for a permanent home," the trial justice concluded that it would be in the children's best interests to terminate Crystal's parental rights as to them "so that her three children may be adopted and provided with permanency."

## II

### Standard of Review

We have long held that "[n]atural parents have a fundamental liberty interest in the care, custody, and management of their child that does not evaporate if they are not model parents or

- 9 -

have lost temporary custody of their child." *In re Natalya C.*, 946 A.2d 198, 202 (R.I. 2008) (quoting *In re Antonio G.*, 657 A.2d 1052, 1057 (R.I. 1995) (citing *Santosky v. Kramer*, 455 U.S. 745, 753 (1982))). We are mindful as well that the termination of parental rights is a "drastic and irreversible" measure and, as such, "due process requires that, before the state may terminate a parent's rights in his or her children, the state must support its allegations *by clear and convincing evidence.*" *In re Max M.*, 116 A.3d 185, 193 (R.I. 2015) (emphasis in original) (internal quotation marks omitted).

Bearing the just-referenced principles in mind, when reviewing a decision terminating parental rights, we "examine[] the record to determine whether legally competent evidence exists to support the findings of the trial justice." *In re Natalya C.*, 946 A.2d at 202. In doing so, "we (1) examine the trial justice's finding of parental unfitness; (2) review the finding that reasonable efforts at reunification were made by the state agency charged with that duty; and (3) review the finding that termination is in the children's best interests." *In re Max M.*, 116 A.3d at 193 (internal quotation marks omitted). And the trial justice's findings "are accorded great weight on appeal and will not be disturbed unless it can be shown that they are clearly wrong or [that] the trial justice overlooked or misconceived material evidence." *Id.* (internal quotation marks omitted).

### III

### Analysis

Crystal argues on appeal that the trial justice: (1) erred in admitting into evidence Dr. Hirsch's report; (2) erred in admitting into evidence Crystal's admission that she had been arrested for possession of marijuana; and (3) erred by overlooking Crystal's compliance with DCYF's case plans and recommendations when she found that DCYF had proved by clear and convincing evidence that Crystal was unfit to parent James, Dalicia, and Dalilah.

- 10 -

Crystal first argues that the trial justice erred by admitting Dr. Hirsch's report because Crystal interprets Rule 706(a) of the Rhode Island Rules of Evidence as providing, in her words, that "only the [c]ourt may appoint an expert;" she further observes that Dr. Hirsch was not appointed by the court. This argument is without merit. First, while Rule 706(a) provides that "[t]he court may appoint any expert witnesses," nowhere does that rule state that *only* the court may appoint expert witnesses. Indeed, subsection (d) explicitly provides that "[n]othing in this rule limits the parties in calling expert witnesses of their own selection." As such, we are of the opinion that the trial justice did not err in admitting Dr. Hirsch's report.

Crystal next argues that the trial justice erred when she admitted into evidence Crystal's testimony about her arrest for possession of marijuana; she posits that Rule 609 of the Rules of Evidence was violated when DCYF failed to produce evidence that her arrest resulted in a conviction. This argument similarly lacks in merit. Rule 609(a) provides, in pertinent part: "For *the purpose of attacking the credibility of a witness*, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record." (Emphasis added.) In the instant case, the trial justice expressly found that Crystal's testimony about her arrest was elicited merely to refresh her recollection as to her prior encounters with DCYF and was not offered to attack her credibility. As such, it is our view that Rule 609 was not violated in this instance. Moreover, even if the testimony about the arrest were erroneously admitted, such error would have been harmless because the record reveals that, in rendering her decision, the trial justice did not rely upon the evidence of Crystal's arrest; rather, she cited to numerous other indicators of Crystal's parental unfitness.[8]

---

[8] *See*, *e.g.*, *Guertin v. Guertin*, 870 A.2d 1011, 1018 (R.I. 2005) (noting that, even where a trial justice has erroneously relied on improperly admitted evidence, such error is harmless if the trial justice "relied on ample evidence independent of [the improperly admitted evidence] to support her ultimate decision * * *"); *Thibaudeau v. Thibaudeau*, 947 A.2d 243, 247 (R.I. 2008)

Crystal next argues that "her efforts to be reunited with her children by complying with the demands of DCYF were overlooked" by the trial justice. It is indeed a basic principle that, "before parental rights may be terminated, a specific finding of parental unfitness must be made."[9] *In re Max M.*, 116 A.3d at 193. However, "a parent whose child is in the care of DCYF has an obligation (1) to maintain contact with the child and (2) to plan for the child's future." *In re Rosalie H.*, 889 A.2d 199, 205 (R.I. 2006) (internal quotation marks omitted). As such, we have held that "a parent's lack of interest in his or her child evidenced by an unwillingness to cooperate with DCYF services can be a basis for a finding of unfitness." *In re Max M.*, 116 A.3d at 194 (internal quotation marks omitted); *see also In re Anthony M.*, 773 A.2d 878, 881 (R.I. 2001).

In the instant case, the trial justice made several specific findings to support her conclusion that Crystal was unfit to parent the children. For example, the trial justice found that, in spite of having been presented with twelve different case plans (four case plans for each child) between April of 2013 and October of 2015, Crystal "did not cooperate with DCYF or with DCYF case plans," and "made no progress with any of the case plan objectives." The trial justice further found that Crystal "denied" that she suffered from post-traumatic stress disorder and refused to engage in mental health counseling due to the fact that, in the trial justice's words, Crystal "felt she did not need any counseling." The trial justice also observed that Crystal was discharged from a number

(concluding that the hearing justice relied on sufficient evidence independent of an improperly admitted report and that, therefore, "[a]ny error in the hearing justice's reference to the report was * * * harmless").

[9]     We note that there are occasions when we are called upon to "review the finding that reasonable efforts at reunification were made by [DCYF]" and to "review the finding that termination is in the children's best interests." *In re Max M.*, 116 A.3d 185, 193 (R.I. 2015) (internal quotation marks omitted). However, on appeal, Crystal has challenged neither the reasonableness of DCYF's efforts at reunification nor the trial justice's finding that the termination of parental rights was in the children's best interests. Accordingly, as is our wont, we will limit our review to the issues properly raised on appeal. *See Gianquitti v. Atwood Medical Associates, Ltd.*, 973 A.2d 580, 590-91 n.10 (R.I. 2009); *see also Johnston v. Poulin*, 844 A.2d 707, 710 n.3 (R.I. 2004).

of programs due to her failure to have complied with the requirements of those programs. Additionally, the trial justice found that Crystal had not seen any of her children since August 17, 2015 and "never petitioned the [c]ourt for visits to be reinitiated" after the visits were suspended in October of 2015.

Our review of the record reveals that there was ample legally competent evidence to support the trial justice's finding that Crystal refused to cooperate with DCYF's reunification efforts and that she did not make any meaningful effort to maintain contact with her children between her last visit on August 17, 2015 and the time of trial several months later. *See In re Gabrielle D.*, 39 A.3d 655, 665 (R.I. 2012). We are further of the opinion that Crystal's refusal to cooperate with the objectives of the case plans constitutes clear and convincing evidence of her lack of interest in her three children and, as such, could properly serve as a basis for a finding of parental unfitness. *See In re Max M.*, 116 A.3d at 194.

Accordingly, we hold that the trial justice did not overlook or misconceive material evidence in finding that Crystal was unfit to parent her three children and that, therefore, the trial justice did not err when she terminated Crystal's parental rights as to James, Dalicia, and Dalilah.

## IV

### Conclusion

For the reasons set forth herein, we affirm the judgment of the Family Court terminating the parental rights of the respondent. The record may be returned to that tribunal.

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | In re James H. et al. |
| **Case Number** | No. 2016-295-Appeal.<br>(00-1831-5)<br>(00-1831-6)<br>(00-1831-7) |
| **Date Opinion Filed** | April 9, 2018 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice William P. Robinson |
| **Source of Appeal** | Providence County Family Court |
| **Judicial Officer From Lower Court** | Asssociate Justice Laureen A. D'Ambra |
| **Attorney(s) on Appeal** | For Petitioner:<br><br>Karen A. Clark<br>Department of Children Youth and Families<br><br>Shilpa Naik<br>Court Appointed Special Advocate<br><br>For Respondent:<br><br>Michael S. Pezzulo, Esq. |

SU-CMS-02A (revised June 2016)