November 18, 2019

**Supreme Court**

No. 2017-113-Appeal.
(14-897-1)

In re Roman A.                    :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

In re Roman A.                              :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Flaherty, for the Court.**  This termination of parental rights case came before this Court for oral argument more than five years after the Department of Children, Youth, and Families (DCYF or the Department) first petitioned to remove the child, Roman A., from his mother, the respondent.  On appeal, the non-Indian mother of an Indian child, who was born suffering from severe medical issues, asserts that the Family Court erred when it terminated her parental rights contrary to the provisions of the Indian Child Welfare Act (ICWA or the Act).[1]  We disagree and affirm the decree of the Family Court.

## I

### Facts and Travel

Roman A. was born to the respondent, Carla Alvarenga (Mother), and Nicolas Noka, who is a member of the Narragansett Indian Tribe of Rhode Island, in February 2014.[2]  Unfortunately,

---

[1] We recognize that many individuals tracing their roots to the native peoples of this country prefer the term "Native American" to "Indian."  We use the term "Indian" in this opinion because the relevant federal statute and caselaw use that term.  We mean no disrespect.

[2] The parties agree that Mother is not Native American.

Roman required immediate treatment for complex congenital heart disease and the infant was hospitalized for nearly all of the first six months of his young life, either in Rhode Island or Massachusetts. Roman was diagnosed with Double Inlet Left Ventricle and Ventricle Septal Defect, colloquially known as being born with "half of a heart." In effect, Roman's heart was unable to properly deliver blood to his lungs.

Roman was required to undergo several medical procedures during the early days and months of his life, some of them very serious and life-threatening. In March 2014, Roman was transported to Boston for a cardiac catheterization, a less invasive means of achieving open-heart surgery whereby wires are inserted through the groin for the purpose of taking pictures of the heart. In May 2014, Roman underwent a second cardiac catheterization. The next month, Roman underwent open-heart surgery. In July, because Roman was having difficulty feeding, a gastrostomy tube, or G-tube, was inserted so that food could be delivered directly to his stomach.

Unfortunately, the heart condition was not the only obstacle the child faced. DCYF had received reports on its hotline from both Hasbro Children's Hospital and Boston Children's Hospital about Roman's family and, in August 2014, a practitioner at Boston Children's Hospital filed a Report of Examination with DCYF. Shortly thereafter, DCYF filed a petition in the Family Court alleging neglect on the part of both Mother and Mr. Noka, and the child was removed from his mother's care via an *ex parte* order of the court. By the end of August 2014, Roman was discharged from the hospital to a foster home.[3]

DCYF created its first of several case plans in October 2014. It is clear from a review of those case plans that reunifying Roman with Mother remained a goal for an extensive period of

---

[3] Roman did spend approximately three weeks at Mother's home between intervening hospital stays during this period.

time. By August 2015, however, DCYF filed a petition to terminate Mother's parental rights, alleging that Roman had been placed in DCYF's custody or care for at least twelve months, that "the parents were offered or received services to correct the situation which led to the child being placed," and that "there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time considering that child's age and the need for a permanent home."[4]

In March 2016, the Family Court was prepared to hold a hearing and take evidence on the initial neglect petition that had been filed by DCYF almost two years earlier, and then proceed, if necessary, to hear DCYF's termination petition with respect to Mother. However, after a conference, the initial petition was amended to add a claim of dependency and the trial justice explained that she was providing Mother with what she termed "an opportunity" for three additional months to become compliant with DCYF case planning. Mother admitted dependency and was ordered to comply. However, when the three-month period provided by the trial justice came to an end, DCYF sought to terminate Mother's parental rights, alleging that Mother, despite the benefit of additional time, had failed to cooperate and comply. Trial commenced in September 2016, and continued over diverse dates until November of that year.

After the trial concluded, the trial justice issued an exhaustive, sixty-two-page written decision in which she summarized the testimony of all witnesses and made fifty-three findings of fact. The testimony particularly relevant to our review includes, among others, a pediatric cardiologist, a social worker, and the director of a department in the Narragansett Tribe. We recount the most relevant testimony as follows.

---

[4] The parental rights of Roman's father were terminated on default upon proof of abandonment. The father has not appealed that decree.

**Dr. Kristin Lombardi**

Kristin Lombardi, M.D., is a pediatric cardiologist who was Roman's treating physician at Women & Infants Hospital and Hasbro Children's Hospital. At the time of trial, Dr. Lombardi had been treating Roman since his birth. She testified as an expert in pediatric cardiology for DCYF, opining that Roman will require significant cardiac care throughout his life and that he is likely to experience neurodevelopmental and cognitive limitations. She also testified that any person who is Roman's caretaker would need to be able to recognize a number of factors to properly care for him, including recognizing changes in his color and his activity level. Doctor Lombardi testified that, despite multiple and lengthy conversations with Mother, Mother "did not have a good grasp on the severity of [Roman's] heart disease[,]" and the doctor expressed concerns about whether Mother could provide the level of care that Roman required.

**Lena Sousa**

Lena Sousa, a DCYF social worker who had been assigned to Roman's case in August 2014 and who remained the social worker on the case throughout its entirety, also testified on behalf of DCYF. She testified that she discussed the concerns of Boston Children's Hospital with Mother that Mother had been unavailable for appointments, procedures, and phone calls and that Mother had failed to comply with the care plan that the hospital had developed. Ms. Sousa also testified about the case plans that DCYF had developed. She said that, in September 2014, she had met with Mother and had explained that a case plan involves services DCYF would request Mother to complete so that the Department could evaluate the prospects for reunification. However, she testified, Mother said that she was not interested in participating in services because she was busy. Ms. Sousa also explained to Mother that DCYF would look to a different goal if Roman remained in DCYF's care for an extended period of time. In spite of Mother's insistence

- 4 -

that she was too busy to participate, the first case plan created by Ms. Sousa nonetheless retained the goal of reunifying Roman with Mother. The case plan included several areas in which Mother needed to make changes or improvements in order to be reunified with Roman, including addressing domestic violence, parenting, mental health, and meeting the medical needs of Roman. Mother was required to engage in a parent/child evaluation, demonstrate that she could meet Roman's needs during visits, make use of parenting and mental health services, attend medical appointments, and act upon doctors' recommendations, including those involving Roman's medications.

Regarding domestic violence, an issue that was included in the case plans as a result of an alleged incident that involved Roman's father at Hasbro Children's Hospital, Ms. Sousa testified that she either made referrals or provided mother with the names of multiple resources. Addressing domestic violence remained in the case plans throughout the case's entirety, because that issue was never addressed by Mother. Anger management also became a part of the case plans following Mother's arrest as the result of a road-rage incident. Ms. Sousa testified that she was forced to send the same list of anger management providers to Mother about eight times in a single week because Mother repeatedly requested the information. Ms. Sousa testified that she was unaware as to whether Mother partook of any anger management services.

With respect to engaging in a parent/child evaluation, Ms. Sousa testified that she referred Mother to John Parsons, Ph.D., a clinical psychologist, but Mother never participated in an evaluation with him. At one point, Mother told Ms. Sousa "something to the effect that * * * she didn't need anyone to tell her she was a good mother and/or label her as mental[.]" When it became clear that the evaluation with Dr. Parsons would not be accomplished, Ms. Sousa made a referral to Brian Hayden, Ph.D., also a clinical psychologist. Mother was willing to comply with Dr.

Hayden, according to Ms. Sousa, but after Dr. Hayden conducted the psychological evaluation of Mother, she refused to return to Dr. Hayden for the parent/child portion of the evaluation because, according to Ms. Sousa, Mother did not like Dr. Hayden's evaluation. Mother did not participate in the parent/child piece of the evaluation until June 2016, nearly two years after the case initially was opened, and did so only after the trial justice ordered her to comply. Ms. Sousa made the referral, to Spurwink Rhode Island, for that completed evaluation.

Ms. Sousa testified that making use of parenting and mental health services had been included in the initial case plan because of reports that Mother blamed hospital and hospital staff and believed that they were targeting her, and also because of conversations Ms. Sousa had with Mother. Ms. Sousa also testified that she provided Mother with the names of multiple service providers that could address Mother's mental health issues. She said that Mother told her that she was willing to go to the Providence Center, and so Ms. Sousa made a call to set up an appointment there on Mother's behalf. When Ms. Sousa called, however, she was told that Mother was required to set up the appointment herself. Mother later informed Ms. Sousa that she had attempted to set up an appointment herself, but that she was unable to do so because there was a waiting list. Ms. Sousa followed up with the agency to inquire about the waiting period, however, and the agency informed Ms. Sousa that there was, in fact, no waiting list. Ms. Sousa testified that she continued to remind Mother that receiving mental health services was a part of the plan. To Ms. Sousa's knowledge, the required mental health services in the final plan were never successfully completed.

Ms. Sousa also testified that she would, either by phone or email, inform Mother about Roman's medical appointments. On one occasion, however, Mother refused to provide her new phone number to Ms. Sousa, while at the same time insisting that she did not receive her emails.

Ms. Sousa also testified that Mother admitted to attending only two of Roman's medical appointments over the seven-month period that spanned from September 2014 to March 2015, even though Roman had approximately three appointments per week. Ms. Sousa testified that on one occasion Mother told her she did not understand how attending appointments would prove that she was capable of caring for Roman. Ms. Sousa testified that attending medical appointments was a part of each case plan DCYF had created, until the termination petition was filed and reunification was no longer the goal, and that, over the entirety of the case, Mother failed to consistently attend medical appointments.

Ms. Sousa also explained that, in September 2014, Mother refused to allow Roman to receive certain injections that the cardiologist had recommended because of Roman's weakened immune system, and also that Mother did not want Roman to receive a flu shot. Ms. Sousa also testified that Mother was not making progress in the area of following doctors' recommendations at the time the second case plan was created. Ms. Sousa testified that Roman's medical needs were a continuous aspect of the case plan.

Ms. Sousa further recounted several troubling occurrences that she learned took place while Mother was with Roman. At one visit, at a time when Roman had a G-tube inserted, Mother attempted to give Roman either apple juice or milk. When it was explained to Mother why this was inappropriate because of the G-Tube, Mother expressed that she had not followed doctors' instructions in the past. Ms. Sousa also testified to another occasion during which the gastroenterologist felt compelled to inform Mother that it was inappropriate for her to give candy to Roman. On another occasion, Ms. Sousa had to review Roman's approved snack list with Mother after she fed a doughnut to Roman, which was not an approved snack. Ms. Sousa further testified that, following a doctor's visit in February 2015, Mother expressed to Ms. Sousa that

Roman was getting sick as a result of his then-foster mother kissing him, and Mother requested that the foster mother neither kiss nor hug Roman.

Ms. Sousa related that, to her knowledge, since March 2016, when the court gave Mother an additional three months to take advantage of the services and comply with DCYF case planning, Mother had failed to complete any of the required services. She also testified that Roman had been in the same foster home for about sixteen or seventeen months, that Roman was comfortable with his foster parents, "wants to be around them all the time[,]" and that the foster home was preadoptive in nature.

### Sarah Dodd

Further germane to this review is the testimony of Sarah Dodd, a family support specialist in the family visitation program at Boys Town New England. Ms. Dodd testified that her job at Boys Town involves monitoring court-mandated visitations and teaching a class called "Common Sense Parenting," which attempts to develop positive parenting skills. Ms. Dodd was assigned to work with Mother in November 2015, and she did so until March 2016. During that period, Ms. Dodd testified, she had approximately sixteen or seventeen visits with Mother. In the program, Mother was permitted to visit with Roman once per week under the supervision of Ms. Dodd and had permission to attend Roman's medical appointments. Ms. Dodd also interacted with Mother through the Common Sense Parenting class.

Although Ms. Dodd said that Mother completed the Common Sense Parenting class, she also testified that Mother struggled to arrive at visitation appointments on time, missed at least one appointment, and would not be prepared for appointments, such as failing to provide a snack for Roman. Ms. Dodd also testified that Mother had expressed to her that she did not appreciate Ms. Dodd's feedback and did not feel that Ms. Dodd's services were necessary.

In March 2016, Ms. Dodd's work with Mother came to an end because Mother was deemed to be noncompliant with the Boys Town visitation program. During the last visit, at which Ms. Dodd informed Mother that she was being discharged from the visitation program, Mother became confrontational and indicated to Ms. Dodd that, in Ms. Dodd's words, "she did not feel that she needed to be part of the program; that she wasn't going to listen to any of our services; that she didn't have to come prepared with the necessary items for the visits."[5] Mother's discharge summary from the Boys Town visitation program, signed by Ms. Dodd, further highlights that Mother was consistently late for visits and was resistant to Ms. Dodd's suggestions.[6]

### Caroline Gojcz

Caroline Gojcz, a licensed independent clinical social worker employed as a clinical supervisor in the family support center at Spurwink Rhode Island, testified as an expert for DCYF. Mother was referred to Spurwink by DCYF for a parent/child evaluation in May 2016 after the Family Court ordered Mother to comply with DCYF. The purpose of the evaluation was to assess Mother's ability to care for Roman and to determine whether it would be appropriate for Roman to return to Mother's care. Ms. Gojcz met with Mother four times individually and twice while Mother was visiting with Roman. It was Ms. Gojcz's expert opinion, based on her review of the

---

[5] During this final visit, Ms. Dodd testified, there was a safety concern involving Mother and her other child, who Ms. Dodd testified was approximately three or four years old at the time. Ms. Dodd explained that: "[T]here was concern of safety that took place with [the other child] and mom. I attempted to intervene several times. Mom told me not to talk to her, not to talk to her children. Our visit room was destroyed." Ms. Dodd later explained that the other child "dumped things out all over the room" and that she was concerned the child might leave the building after she ran down the hallway.

[6] Carol Wild, also an employee of Boys Town New England, briefly testified on behalf of DCYF. Ms. Wild worked with Mother between January 2015 and September 2015, as part of the family visitation program, but ceased working with Mother when she was promoted to a different position within Boys Town. Ms. Wild testified that, even though Mother was initially frustrated with the program, she did make progress and did cooperate with Ms. Wild. She also testified to a letter she wrote that indicated that Mother had made excellent progress.

information she gathered from not only her observations of Mother but also a review of various reports and contacts, that "there is a high risk of [Roman] reunifying with [Mother]."

## Brian Hayden

Testimony was also provided by Dr. Hayden, who was qualified as an expert in clinical psychology. Doctor Hayden evaluated Mother in March 2015 for about three to three-and-a-half hours. Doctor Hayden explained that the results of Mother's personality assessment profile were consistent with a diagnosis for bipolar mood disorder. Doctor Hayden also opined that Mother encounters problems with coping and that she relies on denial and distraction. He also testified that she is prone to fits of rage. Doctor Hayden testified that Mother was "lacking in * * * empathy, the ability to take the perspective of another person's point of view, and to go one step further and to feel genuine compassion and want to take care of somebody." Doctor Hayden also had planned to observe Mother with her children, but Mother failed to show up for the scheduled visitation appointment that Dr. Hayden had attended. Doctor Hayden also testified that when he followed-up, he was informed that Mother did not intend to complete this piece of the evaluation. Although Dr. Hayden testified that he was not in a position to render an opinion about whether Mother could parent Roman safely and effectively, as a result of not having had the opportunity to observe Mother with her children, Dr. Hayden nonetheless said that he had "considerable concerns as to whether [Mother] fully appreciated the seriousness of Roman's medical difficulties[.]" Doctor Hayden testified that Mother "had difficulty in perceiving [Roman needing medical treatment from hospital staff] as individuals who were trying to help her child" and, as an expert in clinical psychology, he "would have some concerns about the appropriateness of [Mother] providing sufficient care, particularly in terms of the safety of Roman."

**Wenonah Harris**

The testimony of Wenonah Harris, the Director of Tribal Child and Family Services for the Narragansett Tribe, which included the roles of the ICWA Director and Child Advocate, was also important. Ms. Harris testified that Roman's father is a member of the Tribe and that Roman also had become an enrolled member of the Tribe. Ms. Harris testified that the Narragansett Tribe had been provided with appropriate notice of the DCYF proceedings involving Roman. She explained that the Tribe declined to accept jurisdiction and participate from the outset because, if the Tribe had accepted jurisdiction in this case, "[Roman] would be dead" because the Tribe does "not have the ability to be [as] sophisticated [as] DCYF" and that "[DCYF] kept him alive when he should have been dead before his first year[.]"

**Mother**

Mother testified on her own behalf over the course of two days. Mother explained that she felt she "had a very good understanding" of how to care for Roman. Mother also testified that taking care of Roman is not "rocket science." She said that she missed some of his doctor appointments because she either was informed too late, was unable to secure transportation to the locations, or was unfamiliar with the locations. Mother also testified that, at the beginning, she was not allowed to attend Roman's doctors appointments. When explaining her understanding of why DCYF got involved in the first place, she testified that, early on when Roman was in the hospital, she would not go to the hospital because Roman's father was stalking her there and therefore she did not feel comfortable at the hospital. Mother testified that she had attended all the medical appointments that she knew about since March 2016. In regard to engaging in DCYF services, she admitted that she did not participate in services initially, that she had engaged in some services prior to being ordered to follow through with services by the Family Court justice in

March 2016, and that she did engage with the majority of services when the Family Court ordered her to do so in March 2016. Mother's partial response to a question on cross-examination is largely representative of her testimony as a whole: "I took the domestic violence classes. My attitude was a problem; I remedied the situation by taking counseling. So I really don't know what else you guys want from me. I did the parent-child eval. I did the psych eval. What else do you want, make you a turkey for Thanksgiving?"[7]

## The Trial Justice's Decision

After hearing all the testimony, and specifically finding Mother's testimony incredible, the trial justice entered a decree granting DCYF's petition to terminate Mother's parental rights. Applying the ICWA, the trial justice found in her written decision that DCYF had met the burden under the ICWA of engaging in active efforts to reunify Roman with Mother, and that she was satisfied beyond a reasonable doubt that Roman would face serious emotional and physical harm if Mother was given custody of Roman. Mother timely appealed.

Before this Court, Mother argues that DCYF failed to engage in active efforts at reunifying Roman with her, that no "qualified expert witness" testified at trial pursuant to the ICWA, and that the trial justice erred in finding beyond a reasonable doubt that she was unfit to parent Roman. DCYF contends that the ICWA does not apply to this case because Mother is non-Indian and Roman's Indian father never had custody, and further argues that if the ICWA does apply, DCYF met its burden under the ICWA.[8]

---

[7] Thanksgiving in 2016 fell on November 24, nine days after Mother made this statement during her testimony. We also note that Roman's foster parent, Adam Connell, testified for DCYF as a rebuttal witness following Mother's testimony. We see no need to recount his testimony for purposes of this opinion.
[8] The guardian *ad litem* in this case sides with respondent as relates to the application of the ICWA but with DCYF with respect to the contention that the record supports the finding that DCYF satisfied the ICWA's requirements.

## II

### Discussion

There can be no dispute that, as an enrolled member of the Narragansett Tribe, Roman is within the ambit of the ICWA, chapter 21 of title 25 of the United States Code. Nonetheless, this case raises questions about the extent of that coverage and whether all the provisions of the ICWA are applicable to the facts presented here. Specifically, do the provisions of § 1912(d) and (f) of the ICWA, which relate to "remedial services and rehabilitative programs designed to prevent the breakup of the Indian family[,]" 25 U.S.C. § 1901(d), and the heightened standard of proof the ICWA demands in a termination of parental rights case, apply to an Indian child who, at the time of termination, is not a part of an Indian family? Second, does § 1912(f) require "testimony of qualified expert witnesses" in a termination of parental rights case such as this, where the Indian child is in the custody of a non-Indian parent? Third, what constitutes "active efforts" under § 1912(d) of the ICWA?

### Application of the Indian Child Welfare Act

As this Court discussed ten years ago, the ICWA recognizes that "there is no resource more vital to the continued existence and integrity of Indian tribes than their children[.]" *In re Tamika R.*, 973 A.2d 547, 550 (R.I. 2009) (deletion omitted) (quoting 25 U.S.C. § 1901(3)). The ICWA further recognizes an unfortunate occurrence in this country's history,

> "that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and
> "[T]hat the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards

prevailing in Indian communities and families." *Id.* (deletion omitted) (quoting 25 U.S.C. § 1901(4) and (5)).

As such, Congress set forth "minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." *Id.* at 550-51 (quoting 25 U.S.C. § 1902). The primary purpose of the ICWA was "to stem the unwarranted *removal* of Indian children from intact Indian families." *Adoptive Couple v. Baby Girl*, 133 S. Ct. 2552, 2561 (2013) (emphasis added).

In this case, the parties agreed to the applicability of the ICWA, and the trial justice applied the provisions in § 1912(d) and (f) of the ICWA after stating on the record that "everyone is in full agreement that ICWA applies." Section 1912(d) states:

> "Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."

Section 1912(f) states:

> "No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."

DCYF asserts that, because Roman's mother is not of Indian heritage and Roman was not at any time in the custody of his father, from whom Roman takes his Indian heritage, the ICWA is inapplicable. This is so, according to the Department, because a breakup of an Indian family never occurred in this case. The Department maintains that its position is supported by the intent of the ICWA, and it draws this Court's attention to the United States Supreme Court's 2013 opinion in *Adoptive Couple*, cited *supra*.

In *Adoptive Couple*, the biological father, a member of the Cherokee Nation, objected to the adoption of his biological daughter, who was 3/256 Cherokee. *Adoptive Couple*, 133 S. Ct. at 2558, 2559. The biological mother, who was non-Indian, relinquished her parental rights and had previously consented to the adoption. *Id.* at 2558. The South Carolina Supreme Court determined that the ICWA applied and that the provisions contained in § 1912(f) and (d) were not satisfied. *Id.* at 2559. The Supreme Court, however, held that, because the father, despite his efforts to invoke the ICWA, "had never had legal or physical custody of [the child] as of the time of the adoption proceedings[,]" he was not entitled to invoke § 1912(f). *Id.* at 2562. This interpretation of § 1912(f), according to the Court, "comports with the statutory text demonstrating that the primary mischief the ICWA was designed to counteract was the unwarranted *removal* of Indian children from Indian families due to the cultural insensitivity and biases of social workers and state courts." *Id.* at 2561. Further, the Supreme Court held that "§ 1912(d) applies only in cases where an Indian family's 'breakup' would be precipitated by the termination of the parent's rights." *Id.* at 2562. The Court reasoned that "when an Indian parent abandons an Indian child prior to birth and that child has never been in the Indian parent's legal or physical custody * * * the 'breakup of the Indian family' has long since occurred, and § 1912(d) is inapplicable." *Id.*

Mother and the guardian *ad litem*, on the other hand, each argue that the ICWA does apply. Mother points out that the ICWA applies because the Code of Federal Regulations states that the "ICWA includes requirements that apply whenever an Indian child is the subject of * * * [a] child-custody proceeding[.]" 25 C.F.R. § 23.103(a)(1) (2016). Mother also argues that the holding in *Adoptive Couple* is inapposite.

We are of the opinion that, simply because the ICWA may in general apply "whenever an Indian child is the subject of * * * [a] child-custody proceeding," 25 C.F.R. § 23.103(a)(1), it does

not follow that every provision of the ICWA applies each time the ICWA is implicated. For example, § 1912(a) of the ICWA dictates that notice shall be given to the tribe of the Indian child any time there is an "involuntary proceeding in a State Court[.]" This provision would seem to apply even to an Indian child who had been previously adopted by non-Indian parents who are subsequently subject to a termination of parental rights proceeding. In such a case, even though the child has already been removed from his Indian family, the tribe would still have an interest in the child's placement, and the tribe must be notified. *See* § 1912(a) (requiring notice to child's tribe in termination of parental rights cases); *see also Mississippi Band of Choctaw Indians v. Holyfield,* 109 S. Ct. 1597, 1609 (1989) ("The numerous prerogatives accorded the tribes through the ICWA's substantive provisions * * * must * * * be seen as a means of protecting not only the interests of individual Indian children and families, but also of the tribes themselves.").

On the other hand, § 1912(d), which addresses remedial services and rehabilitative programs "designed to prevent the breakup of the Indian family," would seem far less relevant. *See Adoptive Couple*, 133 S. Ct. at 2563 ("Section 1912(d) is a sensible requirement when applied to state social workers who might otherwise be too quick to remove Indian children from their Indian families. It would, however, be unusual to apply § 1912(d) in the context of an Indian parent who abandoned a child prior to birth and who never had custody of the child.").[9]

---

[9] We note that Mother also argues that the so-called "existing Indian family doctrine," which apparently allows state courts, according to Mother, "to refuse to apply provisions of the [ICWA] * * * when the court finds the connection between the parent or the child to Indian culture to be too tenuous[,]" is a minority position. Nevertheless, Mother does not have a tenuous relationship with Indian culture, she is simply not of Indian heritage. What's more, at the time of the termination trial, Roman did not have a custodial parent who was Indian because his father's rights were previously terminated. In any event, we have already noted *supra* that the ICWA, as a whole, applies in any relevant case based on the existence of an Indian child, but that every provision may not necessarily be relevant.

After reviewing the relevant case law, this Court has grave reservations as to whether the provisions contained in § 1912(d) and (f) apply in this case.[10] Nevertheless, because (1) all parties agreed at trial that the Act should apply; (2) relying on that agreement, the trial justice applied both provisions; and (3) it was not until this appeal that one of the parties, DCYF, first questioned the applicability of the Act, we will assume without deciding that the provisions contained in § 1912(d) and (f) of the ICWA apply in this case. We observe that the application of these provisions will in no way prejudice the child because, as discussed below, the ICWA imposes a higher burden on the state than does our traditional framework in a case involving the termination of parental rights.

**Standard of Review**

Having determined that § 1912(d) and (f) of the ICWA will be applied given the posture of this case, it is necessary to discuss how those provisions impact the typical framework this Court applies in review of a decree terminating parental rights. In the typical review, this Court: "(1) examine[s] the trial justice's finding of parental unfitness; (2) review[s] the finding that reasonable efforts at reunification were made by the state agency charged with that duty; and (3) review[s] the finding that termination is in the child[ ]'s best interests." *In re James H.*, 181 A.3d 19, 25 (R.I. 2018) (quoting *In re Max M.*, 116 A.3d 185, 193 (R.I. 2015)). In conducting this review, the Court determines if the state's allegations are supported "*by clear and convincing evidence.*" *Id.* (quoting *In re Max M.*, 116 A.3d at 193). While clear and convincing evidence must be found, this Court nonetheless affords the trial justice considerable discretion and examines "the record to determine whether legally competent evidence exists to support the findings of the trial justice." *Id.* (quoting

---

[10] The Court does recognize that at least one other court has held that in a case involving the termination of parental rights of a non-Indian parent, that parent must still receive active efforts under § 1912(d) of the ICWA, in spite of the Supreme Court's holding in *Adoptive Couple v. Baby Girl*, 133 S. Ct. 2552 (2013). *See In re Adoption of T.A.W.*, 383 P.3d 492, 506-07 (Wash. 2016).

*In re Natalya C.*, 946 A.2d 198, 202 (R.I. 2008)). "[T]he trial justice's findings 'are accorded great weight on appeal and will not be disturbed unless it can be shown that they are clearly wrong or that the trial justice overlooked or misconceived material evidence.'" *Id.* (brackets omitted) (quoting *In re Max M.*, 116 A.3d at 193). Questions of law, including those of statutory construction, however, are reviewed, as always, *de novo*. *In re Tamika R.*, 973 A.2d at 550.

With respect to this appeal, the contours of our review are altered by the application of both § 1912(d) and (f). Again, § 1912(f) dictates that there will be no termination of parental rights without "a determination, supported by evidence *beyond a reasonable doubt*[.]" (Emphasis added.) Moreover, § 1912(d) dictates that the "party seeking to effect * * * termination of parental rights * * * shall satisfy the court that *active efforts* have been made to provide remedial services and rehabilitative programs[.]" (Emphasis added.) Therefore, when considering a parent's appeal from a decree terminating parental rights in which those particular provisions of the ICWA are implicated, this Court will first determine whether there exists "legally competent evidence[,]" *In re James H.*, 181 A.3d at 25 (quoting *In re Natalya C.*, 946 A.2d at 202), sufficient to support the trial justice's finding beyond a reasonable doubt that "the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." Section 1912(f). If so, then it can be said that the parent is unfit.

Second, this Court will evaluate whether there exists "legally competent evidence" sufficient to support the trial justice finding "*by clear and convincing evidence*" that active "efforts at reunification were made by the state agency charged with that duty[.]" *In re James H.*, 181 A.3d at 25 (quoting *In re Max M.*, 116 A.3d at 193); *see* § 1912(d). While Mother argues that whether active efforts were made is a question of law that should be reviewed *de novo*, we disagree. Whether there exists evidence sufficient to support a finding of active efforts is within the purview

of the factfinder, who hears the testimony and is uniquely suited to make credibility determinations. *See State v. Paola*, 59 A.3d 99, 106 (R.I. 2013) ("This Court affords 'a great deal of respect to the factual determinations and credibility assessments made by the judicial officer who has actually observed the human drama [of the] trial and who has an opportunity to appraise witness demeanor and to take into account other realities that cannot be grasped from a reading of a cold record.'") (brackets omitted) (quoting *State v. DiCarlo*, 987 A.2d 867, 872 (R.I. 2010)). It is also worth noting that the guardian *ad litem* argues before this Court that all factual findings needed to be made beyond a reasonable doubt when considering both § 1912(d) and (f). This is not quite accurate. While § 1912(f) relating to parental unfitness specifically uses the reasonable doubt language, § 1912(d), involving active efforts, does not. In reviewing whether active efforts were made by DCYF, then, such efforts need only be established by clear and convincing evidence, per our typical review. *See In re James H.*, 181 A.3d at 25.

Finally, the Court will evaluate whether "legally competent evidence exists[,]" again to support the trial justice's finding "*by clear and convincing evidence*[,]" that the termination is in the child's best interest. *In re James H.*, 181 A.3d at 25 (quoting first *In re Natalya C.*, 946 A.2d at 202, then *In re Max M.*, 116 A.3d at 193). This three-pronged approach comports with the state's heightened burden requirement where necessary and ensures fairness to both the parent and the child. In this appeal, Mother contests only the trial justice's analysis under § 1912(d) and (f). We therefore cabin our review to whether parental unfitness and active efforts were sufficiently proven.[11]

---

[11] While we do not analyze the third prong of this tripartite test, based on the arguments advanced on appeal, an exhaustive review of the record leaves this Court thoroughly convinced that the termination of Mother's rights is in Roman's best interest.

**Parental Unfitness**

Mother asserts that the trial justice erred in finding, beyond a reasonable doubt, that her continued custody would likely result in serious damage to the child. Mother also argues that no "qualified expert witness" was presented to the trial justice, as Mother insists is required by § 1912(f) of the ICWA.

The first argument is one of factual analysis, and the second is a legal matter. We will evaluate the second argument first. As noted *supra*, § 1912(f) of the ICWA dictates that: "No termination of parental rights may be ordered * * * in the absence of a determination * * * including testimony of qualified expert witnesses, that the continued custody of the child * * * is likely to result in serious emotional or physical damage to the child." Regarding Mother's assertion that there was no "qualified expert witness," this raises two issues. First, was a "qualified expert witness" required in this case, and, if so, what kind of expert?

A plain reading of the ICWA directs that, in every termination of parental rights case under the ICWA, the testimony of at least one qualified expert witness is required to support a conclusion beyond a reasonable doubt that continued custody is likely to result in serious damage to the child. Section 1912(f). A qualified expert witness is thus required. *See Alessi v. Bowen Court Condominium*, 44 A.3d 736, 740 (R.I. 2012) ("It is well settled that when the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings.") (quoting *Waterman v. Caprio*, 983 A.2d 841, 844 (R.I. 2009)). The second, and slightly more difficult, question is, in which area must this expert be qualified?

The United States Department of the Interior, Bureau of Indian Affairs, recently promulgated updated guidelines to "promote compliance with ICWA's stated goals and

provisions[.]" Guidelines for State Courts and Agencies in Indian Child Custody Proceedings, 80 Fed. Reg. 10146-02 (Feb. 25, 2015). The updated guidelines state that "[a] qualified expert witness should have specific knowledge of the Indian tribe's culture and customs." *Id.* at 10157. The supplementary information explaining updates to the guidelines states that "[c]ommenters indicated that some States rely on witnesses' qualifications as child care specialists, or on other areas of expertise, but do not require any expert knowledge related to the tribal community" and that "[t]he updated guidelines establish a preferential order for witnesses who are experts in the culture and customs of the Indian child's tribe" to "ensure that the expert witness with the most knowledge of the Indian child's tribe is given priority." *Id.* at 10149. This clearly suggests that the Bureau of Indian Affairs envisions the "qualified expert witness" to be an individual with expertise in the cultural affairs of the child's Indian tribe.

The guidelines, however, are not binding on this, or any, court. Moreover, it would exceed the bounds of common sense to hold that an expert witness on Indian cultural affairs was necessary to prove that a child's reunification with a parent was "likely to result in serious emotional or physical damage to the child" when the evidence for and against termination is noncultural. Section 1912(f); *see In re Tamika R.*, 973 A.2d at 552 (suggesting that some grounds for separation may be "sufficiently 'culturally neutral' as to vitiate the need for testimony from a qualified expert witness" under § 1912(e)). Simply put, in culturally-neutral termination cases, such as the one before us now, about what would an expert in Indian affairs testify? It is our considered opinion that, while at least one qualified expert witness is necessary under § 1912(f), that expert may be qualified in any relevant area if, as here, the case presents no culturally-relevant issues. In this case, DCYF elicited the testimony of three relevant expert witnesses: Dr. Kristin Lombardi, who testified about Roman's serious and tenuous medical condition; Ms. Gojcz, a licensed independent

clinical social worker possessing more than a decade of experience, who testified with respect to her parent/child evaluation of Mother and Roman; and Dr. Brian Hayden, who testified about the psychological evaluation that he administered with respect to Mother. This Court is thus convinced that the expert witness component of § 1912(f) was satisfied in this case.[12]

With respect to the trial justice's finding beyond a reasonable doubt that Mother's continued custody would likely result in serious damage to the child, Mother marshals several arguments as to why this finding was in error. She asserts that her own trial testimony demonstrated that she had a comprehensive understanding of the care that Roman requires. She also argues that her ability to care for Roman was supported by a favorable report issued by Ms. Wild, Mother's first contact at Boys Town of New England. Nevertheless, the trial justice specifically found Mother's testimony to be lacking in credibility; and a needle or two of favorable evidence reposited in a veritable haystack of unfavorable evidence cannot lead us to say that the trial justice was clearly wrong.

Mother further asserts that "[b]oth the parent-child evaluator and the child protection consultant at the Habsro Children's Hospital Aubin Child Protection Center agreed that Mother understood what was going on medically with Roman." This statement, however, when viewed in context, is at best misleading and at worst simply untrue. Even though the child protection consultation report says that "Mother showed an extensive understanding of Roman's condition and asked reasonable and well thought out questions throughout[,]" that same report states:

---

[12] The trial justice considered Wenonah Harris, the ICWA Director and Child Advocate for the Narragansett Tribe, to have testified as an expert. We note, however, that, in the main, Ms. Harris provided testimony relating to the notice requirement of the ICWA rather than testimony about whether Roman would be harmed if he remained in the custody of Mother. Therefore, in evaluating whether an appropriate "qualified expert witness" testified under § 1912(d), we do not factor Ms. Harris's testimony into our analysis.

"[M]other has not been present at the bedside to receive teaching regarding Roman's medical care including NG tube feeds, his methadone wean and care the wound from the IV infiltrate."  This document clearly cuts both ways.  Moreover, our review of the record indicates that the parent-child evaluator at Spurwink, Ms. Gocjz, did not testify that Mother understood what was going on medically with Roman.

Lastly, Mother argues that the testimony by Ms. Gocjz and Dr. Hadyen, the clinical psychologist, does not support the conclusion that Roman's reunification with Mother would create a likelihood of harm to Roman.  We are not persuaded by this argument.  The question as to whether reunifying Roman with Mother would likely result in harm to Roman is to be determined based on the entirety of the evidence presented to the trial justice.  As a review of the testimony and the record in this case reflect, there was an abundance of evidence at trial from which the trial justice could make such a determination.  We will not disturb her conclusion.

### Active Efforts

Mother argues that DCYF failed to engage in "active efforts" to reunify Roman with her, as is required by the ICWA in § 1912(d).  This Court has yet to examine what constitutes "active efforts" under the ICWA.  Some courts may have adopted various phraseologies for determining what such efforts are. *See e.g.*, *Dashiell R. v. State, Department of Health and Social Services, Office of Children's Services*, 222 P.3d 841, 849 (Alaska 2009) ("As opposed to passive efforts such as simply developing a plan for the parent to follow, active efforts require that the state actually help the parent develop the skills required to keep custody of the children."); *In re J.S.*, 177 P.3d 590, 594 (Okla. Civ. App. 2008) (describing active efforts as "leading the horse to water"); *Department of Human Services v. D.L.H.*, 284 P.3d 1233, 1240 (Or. Ct. App. 2012) ("We have defined 'active efforts' to 'impose on DHS an obligation greater than simply creating a

reunification plan and requiring the client to execute it independently. Active efforts means that DHS must assist the client through the steps of a reunification.'") (brackets omitted) (quoting *State ex rel. Juvenile Department of Multonomah County v. T.N.*, 203 P.3d 262, 263 (Or. Ct. App. 2009)). We need not undertake that type of task here, however, because this Court is satisfied that DCYF's efforts constituted "active efforts" by any conceivable definition of the term.[13]

While Mother advances several reasons in support of her argument that DCYF did not provide "active efforts" at reunification, each is unavailing. For example, Mother asserts that DCYF "did not seem to have been operating under the impression that 'active efforts' were required[,]" and cites to Ms. Sousa's testimony that she was only "[k]ind of" aware that the ICWA requires "active efforts." Nevertheless, the knowledge of Ms. Sousa, who is a social worker, as to the requirements of a complicated federal statute that has been the subject of litigation at the Supreme Court does not determine whether the "active efforts" requirement in the ICWA was satisfied in this case. Additionally, Mother's argument, made both in her brief and at oral

---

[13] We observe that on December 12, 2016, less than a month before the trial justice issued her decision in this case, a new federal regulation promulgated by the Bureau of Indian Affairs was made effective, defining "active efforts" under the ICWA:

"Active efforts means affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family. Where an agency is involved in the child-custody proceeding, active efforts must involve assisting the parent or parents or Indian custodian through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan. To the maximum extent possible, active efforts should be provided in a manner consistent with the prevailing social and cultural conditions and way of life of the Indian child's Tribe and should be conducted in partnership with the Indian child and the Indian child's parents, extended family members, Indian custodians, and Tribe. Active efforts are to be tailored to the facts and circumstances of the case." 25 C.F.R. § 23.2 (2016).

This Court is satisfied that, even under this definition, appropriate "active efforts" were made by DCYF in this case.

argument, that the services in the case plans were not tailored, and that she should have been provided access to a special support program at Boston Children's Hospital related to families with children having heart problems, is also not persuasive. It defies logic, based on the record and facts of this case, to think that Mother would have been an avid participant in DCYF's services if only she had been referred to this one particular program. Ms. Sousa testified that, at the beginning of the case, Mother felt she was too busy to work with DCYF and, in a conversation that took place in January 2015, Mother again told Ms. Sousa that she was too busy to participate in services. Further, Mother was not successful in meeting case plan requirements such as attending Roman's medical appointments with regularity.

Other arguments that Mother asserts on the issue of active efforts are similarly unpersuasive. They either rely on Mother's testimony, which the trial justice found to be incredible, or they are outweighed by other facts in the record. The record clearly establishes that DCYF created multiple case plans with the express objective of reunification. Ms. Sousa, the social worker assigned to work on Roman's case throughout its entirety, made referrals to various resources throughout the case and explained to the Family Court that DCYF would pay for those services when necessary. The trial justice's findings "that DCYF continued to do more than merely offer a plan to mother and wait for her to act" and that "[t]here was no *credible evidence* that contradicted the active efforts made by DCYF to reunify Roman with his mother" are not clearly wrong. It is our firm opinion that the trial justice did not err when she found that DCYF had satisfied its burden to show that it made active efforts to attempt to reunify Roman with Mother.

**III**

**Conclusion**

For the reasons set forth in this opinion, the decree of the Family Court is affirmed.  The record in this case may be returned to the Family Court.

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | In re Roman A. |
| **Case Number** | No. 2017-113-Appeal. <br> (14-897-1) |
| **Date Opinion Filed** | November 18, 2019 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Francis X. Flaherty |
| **Source of Appeal** | Providence County Family Court |
| **Judicial Officer From Lower Court** | Associate Justice Laureen A. D'Ambra |
| **Attorney(s) on Appeal** | For Petitioner: <br><br> Karen A. Clark <br> Department of Children Youth and Families <br><br> Susan M. Fink, Esq. <br> Guardian Ad Litem <br><br> For Respondent: <br><br> Megan F. Jackson <br> Office of the Public Defender |